MARILYN SHEPHERD, PLAINTIFF-RESPONDENT-CROSS-APPELLANT, v. ALBERT J. WARD, DEFENDANT-APPELLANT-CROSS-RESPONDENT.

ALBERT J. WARD, PLAINTIFF-APPELLANT-CROSS-RESPONDENT, v. MARILYN S. WARD, DEFENDANT-RESPONDENT-CROSS-APPELLANT.

Argued May 15, 1950—Decided June 19, 1950.

*Mr. George W. C. McCarter* argued the cause for the wife, Marilyn Ward, alias Marilyn Shepherd (*Messrs. McCarter, English & Studer,* attorneys).

*Mr. Dougal Herr* argued the cause for the husband, Albert J. Ward.

The opinion of the court was delivered by

CASE, J. These cases come up on appeals and cross-appeals. The parties were husband and wife. The wife obtained a divorce in the State of Florida and then sued thereon in New Jersey for alimony. The alimony suit was dismissed by the Superior Court of New Jersey, Chancery Division. On appeal the Appellate Division reversed and remanded. The husband appeals generally from that judgment of reversal and the wife

appeals from so much of it as failed to fix alimony, suit money and counsel fee and as denied counsel fee on the appeal. The husband, after the wife obtained her Florida decree, filed a petition for divorce in Chancery of New Jersey and was awarded a judgment *nisi,* which was appealed by the wife to the Appellate Division and there reversed. The husband appeals generally from that judgment also, and the wife appeals from so much of it as denies her a counsel fee. A more particular statement of the proceedings follows.

The Florida decree was strictly a divorce *a vinculo matrimonii,* without prejudice to the assertion of pecuniary or property rights in a court having jurisdiction. On June 18, 1948, four days after that decree was rendered, Mrs. Ward filed her bill for alimony in Chancery of New Jersey.

Meanwhile, Dr. Ward had instituted an injunction proceeding in the New Jersey Court of Chancery. On or about April 17, 1948, he had received, by mail, a notice to appear and an order of publication in his wife's Florida divorce proceedings. On April 27, 1948, he filed his bill of complaint praying that his wife and her attorneys be restrained from proceeding further with the Florida suit and from entering or taking any order or decree therein except a decree dismissing the suit. An order to show cause, with stay, issued and was served upon Mrs. Ward in the manner therein directed. Full and timely notice is admitted. On the return, May 10, 1948, Chancery issued an injunctive order in accordance with the prayer of the bill. That order, also, was served in accordance with its terms, including service on Mrs. Ward and her attorney in Florida. Mrs. Ward was brought into the proceeding by publication and substituted service but she did not answer or otherwise appear. She totally disregarded the injunction and prosecuted her Florida proceeding to a decree.

On September 14, 1948, the husband, with court leave, filed what the parties term an amendment by way of supplement to the bill in the injunction suit, charging that his wife had obtained the Florida decree contrary to, and in defiance of, the Chancery restraint; and praying that the Florida decree

be determined to have no force or effect in this State. Mrs. Ward and her Florida attorney were given notice, in compliance with the order and the practice, by registered mail, duly received, of the amendment to the bill and were accorded time within which to answer. She filed no answer and made no appearance at any time in that suit. The matter was set for final hearing on December 15, 1948, at which time it was adjudged that the Florida decree was null and void and of no effect in this State. The judgment remains of record and has not been directly attacked.

To go back to the bill in Chancery for alimony:—On being served as a party defendant Dr. Ward answered, setting up the several matters hereinafter discussed. By later supplement to the answer, he pleaded the decree in the injunction proceedings declaring the Florida decree void.

On September 14, 1948, and before the alimony suit came on for hearing, Dr. Ward filed his petition for divorce on the ground of desertion in Chancery of New Jersey, pleaded the Florida decree and the injunction order and alleged that the decree was void because neither party was domiciled in the State of Florida and Dr. Ward had not appeared in the proceeding, and prayed that the Florida decree be adjudged void and that the marriage be dissolved in the New Jersey proceeding. Mrs. Ward answered that the injunctive order was not duly made or entered, that personal jurisdiction over her had not been obtained, that to give effect thereto would be a violation of the Fourteenth Amendment of the Constitution of the United States, that her residence was truly in the State of Florida, that the courts of that state had rendered unto her a valid decree of absolute divorce before the commencement of the New Jersey divorce suit, that the Florida decree was, under Article IV, Section 1 of the Constitution of the United States, entitled to due faith and credit and that consequently Dr. Ward was not, at the commencement of his New Jersey suit, the husband of the pleader.

The alimony suit and the New Jersey divorce suit were tried together in the Superior Court, Chancery Division, which

had then, by reason of the changes in our court system, taken over the litigation. That court sustained Dr. Ward's contentions, upheld the injunction suit and the decree on the amended bill, struck down the Florida decree, denied alimony and granted Dr. Ward a judgment *nisi* in his New Jersey divorce action. Judgment final went against Mrs. Ward in the alimony suit on April 22, 1949, and the judgment *nisi* was entered in Dr. Ward's divorce action on April 25, 1949. On Mrs. Ward's appeals to the Appellate Division the judgment in Dr. Ward's suit for divorce was reversed, without costs, and the judgment in the alimony suit was reversed and the cause remanded for further action respecting amount of alimony, if any, suit money and counsel fee, but without counsel fee on the appeal.

Both parties are natives of New Jersey. They were married here September 6, 1941, had their matrimonial domicile at Morristown, New Jersey, where both had previously resided, and cohabited there until August 21, 1946. There were no children born of the marriage.

The substance of Mrs. Ward's complaints about her husband was that while he was kind, considerate and generous, his professional labors frequently did not leave him the time and energy to share with her the sort of social life she wished to lead and the extent of his manifestation of sexual impulse was not satisfying to her.

Dr. Ward's practice was in Morristown and Dover, New Jersey. He was one of four doctors practicing as a group. They were in general practice with one specializing in pediatrics and Dr. Ward in surgery and obstetrics. Following the wedding professional engagements kept Dr. Ward and his bride in Morristown until October 6, 1941, when the two left for the west on their wedding trip, returning soon after November 1st. On December 7th this country became involved in the war. First one and then another and finally the third member of the group of doctors went into the service, leaving Dr. Ward to care for the practice, greatly magnified by the industrialization of the war plants and by the absence of other

doctors of the community in war work. Mrs. Ward understood thoroughly the pressure under which he worked. She testified :—

"His offices were open started (starting ?) at five o'clock in the afternoon and the telephone rang constantly. I preferred to take them rather than have the maid do that. I felt I could handle them, possibly, more intelligently because of the terrific pressure under which he was working, many patients who had colds, mostly colds, on many occasions I said to them, 'I know if Dr. Ward were—he would recommend sulfa thiazol and juice of fruits,' and when Dr. Ward came in the evening I would tell him of the telephone calls. He frequently didn't come home from his work until nine or ten o'clock; occasionally, eleven and twelve o'clock. I waited dinner for Dr. Ward regardless of how late he came in and I got up every morning to have breakfast with him about six-thirty. He operated at the hospital at eight o'clock. We had little enough time together and I made it a point to get up and have breakfast and to wait dinner for him and to relieve him as much as I possibly could. As a matter of fact, I made a call for him one day. He didn't have the time to check on a patient and the patient didn't have a telephone. He asked me to go over and find out how the patient was doing which I was more than glad to do. I asked what I felt were questions Dr. Ward would have asked and related the answers back to him and he was satisfied everything was satisfactory. Dr. Ward had heavy calls and he didn't give up. He kept going. I admired him for it. I drove him in the middle of the night to hospitals and waited for him to deliver babies and perform operations."

And again, her testimony :—

"Q. During those five years, both on vacations and when you were home, the doctor was infrequent in his sexual relations and you resented that? A. I resented that and I resented the fact because of that there was no possibility of a family. I was very much interested in having children. I would have been interested in a greater social life. I was aware of the fact he was physically and mentally exhausted when he came home at night. I was sympathetic and co-operative and understanding as far as I could."

The strange thing is that the wife, manifesting a degree of sympathy and helpfulness, did not experience greater tolerance for the impact of the strain upon her husband's domestic life and did not find compensating joy in the fact that her husband, although impaired in his usefulness to her by the exigencies of war, was nevertheless spared to her at a time when

many another woman's husband was doing his part at distant points of danger. Mrs. Ward's charge that her husband gave no thought to having children does not coincide with the fact that during less than five years of living with him she was pregnant three times and suffered three miscarriages, the first soon after their marriage, the second a year and a half later and the third after a like interval. Illustrative of the social difficulties: The couple entertained at a cocktail party; in the twenty-four hours within which that event came Dr. Ward went to the Orange Memorial Hospital four different times and did four operations for acute appendicitis; and because of one of them was obliged to leave the party. Nevertheless, the two enjoyed extended experiences of happy and uninterrupted association. Dr. Ward took a vacation of a month in the summer and of from one to three weeks in the winter and always took Mrs. Ward with him to share in all that he did.

Mrs. Ward's mother, testifying, said that it seemed perhaps the marriage "could never have been a success because of the difference in age, because of the fact Dr. Ward was so very busy and tied down." Dr. Ward was Mrs. Ward's senior by twenty years. But Mrs. Ward knew of those conditions before she took the marriage vows. She was aware of Dr. Ward's age, and she was on full notice that in marrying him she was becoming the wife of a professional man absorbed in a demanding work which would seriously interfere with social activities. The minister who was to perform, and who did perform, the marriage ceremony had an intimate talk with her before the marriage in which he cautioned her that a doctor's time belonged not to himself but to humanity and that she would need to be very considerate of the fact that the man she was marrying would be obliged to give much of his time and thought to other people and that she as the wife of a busy physician would need to make sacrifices; and she replied that she realized such was the truth.

Notwithstanding the unhappy frame of mind which Mrs. Ward periodically experienced from the time of her marriage forward she time and again registered in unmistakable man-

ner her recognition of her husband's generosity, love and loyalty. The following is a letter written by her to him a year or less before she left him:—

"Did I remember to tell you that you are much too good to me always, but that I do appreciate it and all that you are to me though I must at times seem an ungrateful wretch to you and did I remember to tell you also that you are the epitome of all that is good and kind and just, sympathetic and understanding, loyal, honest, and fair, devoted, loving, and true both in your profession and in your home, and that you are far more patient with me, your wife, than I deserve? And that I love you for all of those qualities because they are you and because all who know you love you for them too. And do you know that you are the ideal that every woman hopes for in her husband and that I'm the lucky and extremely proud wife of that ideal which is the very real you? And that I sometimes loath me for not showing my love and appreciation for you always as there is no one who deserves it more—and that I do love you to death and pray that you will love me always as you do now."

On August 21, 1946, Mrs. Ward left her husband and their home and went to her parents' home in Maplewood, New Jersey, where she remained until her departure for Florida. We find factually that she did not go with her husband's consent or acquiescence and that her going was not preceded, accompanied or followed by abandonment or other matrimonial offense on his part. This applies also to Mrs. Ward's going to Florida and to any effort by her to establish a domicile there. Dr. Ward's honest, forceful and repeated efforts to induce his wife to return are beyond doubt. They are summarized in this question asked of, and answered by, Mrs. Ward:—

"Q. As I understood it, after you left the doctor, he tried to get you to come back and he repeatedly tried to get you back. A. Yes. It was as a result of those repeated efforts I left the State of New Jersey to get as far away from Dr. Ward as I possibly could."

Mrs. Ward went from New Jersey to Florida on October 22, 1947. That was a year and two months after she had left her husband. She says that she went because she wanted to be away where she could be completely free to think uninter-

ruptedly and without any interference. She admitted on cross-examination that after she left her husband and before she went to Florida "I didn't read his letters. I had no interest in his letters and if I read them, it was very casually * * *." And in that same interval, that is, after leaving her husband and before going to Florida, Mrs. Ward told a mutual friend that she hoped some day they (she and her husband) would be able to get a divorce with no unpleasantness to anyone. Mrs. Ward further testifies that on "any number of occasions" while she and her husband were still living together she had brought up the question of divorce and that her husband had said that if she brought a suit for divorce he would fight it.

Beyond peradventure Mrs. Ward was through with her husband and with the marriage before she left this State. We conclude from the proofs that her plan was then formed— she would go to Florida for a divorce and come back to New Jersey for alimony—and that she never changed that plan. She had consulted with a New Jersey lawyer before she left, the same lawyer who subsequently attended to such matters, whether in New Jersey or Florida, as required the attention of a New Jersey attorney and who represents her in these proceedings. She had never been in Florida except once several years earlier on a vacation trip with her parents. She had no friends or contacts there. The period of residence required of a divorce suit plaintiff in Florida appears to be ninety days. On January 30, 1948, she called upon a Florida attorney to begin suit. That was a week more than the ninety days. The complaint was filed April 14, 1948. On or about March 14, 1948, during the period preceding the filing of her divorce papers, when the domicile, with *animus manendi* and *animus non revertendi,* in Florida was essential to jurisdiction, she stated that "she was down in Florida and that she was in the process of getting a divorce and that she would undoubtedly return to New Jersey after everything was cleared up;" further, the witness who so testified was asked, and answered, thus:—

"Q. Did she say anything about her intention with respect to her residence in Florida? A. That she would probably return to Jersey after things were all settled."

The Advisory Master who saw and heard the witnesses placed the stamp of credibility upon that testimony, and, notwithstanding the criticism thereof expressed in the Appellate Division, we accept it as truly given and as a correct portrayal by Mrs. Ward of the facts of her own mind. Apart from other elements in the case leading to the same result we find that Mrs. Ward did not have the intent essential to the establishment of a domicile in Florida and that therefore her divorce proceeding was a fraud upon the courts of that state. Therefore the decree is null and void, and of no force or effect here, either standing alone or as a ground for seeking alimony. However, we proceed to consider other aspects of the case.

■ The Florida decree, as we have said, was strictly a divorce *a vinculo matrimonii*. The application for alimony rests upon our statute, *R. S.* 2:50–37, which in its pertinent parts provides:—"* * * after judgment of divorce, whether obtained in this State or elsewhere, the court may make such order touching the alimony of the wife * * * as the circumstances of the parties and the nature of the case shall render fit, reasonable and just * * *."

That section is to be read with *R. S.* 2:50–35, *R. S.* 2:50–10 and *R. S.* 2:50–11. *R. S.* 2:50–35 provides:—

"Full faith and credit shall be given in all courts of this State to a judgment of annulment of marriage or divorce by a court of competent jurisdiction in another State of the United States when the jurisdiction of such court was obtained in the manner and in substantial conformity with the conditions prescribed in sections 2:50–9, 2:50–10 and 2:50–11 of this Title. Nothing herein contained shall be construed to limit the power of any court to give such effect to a judgment of annulment or divorce by a court of a foreign country as may be justified by the rules of international comity; provided, that if any inhabitant of this State shall go into another State or country, in order to obtain a judgment of divorce for a cause which occurred while the parties resided in this State, or for a cause which is not ground for divorce under the laws of this State, a judgment so obtained shall be of no force or effect in this State."

The Florida suit was grounded in a charge of extreme cruelty, but Mrs. Ward concedes that the conduct of her husband did not amount to extreme cruelty as defined by New Jersey decisions. It is clear that it did not, that her husband had committed no matrimonial offense which was a ground for divorce or separate maintenance in this State, and that Mrs. Ward's reliance, in the Florida court, was upon an offense alleged to have been committed in this State before she went to Florida. Without giving a full recital of sections 10 and 11, it is enough to say that if, in conjunction with section 35 just quoted at length, they be applied to the facts of the present case, full faith and credit, in so far as the statute goes, are not to be given to the decree of the Florida court for the reason that the jurisdiction of that court was not obtained in substantial conformity with the New Jersey statutory requirement; Mrs. Ward was not a *bona fide* resident of the State of Florida at the time the cause of action arose; she did not remain so for two years next preceding the commencement of the suit; she did not become a *bona fide* resident of the State of Florida after the cause of action arose and remain so for at least two years next preceding the commencement of the suit; the cause of action, while alleged to be extreme cruelty, was not of such character as is recognized in this State or was so recognized at the time the cause of action arose; and Dr. Ward was never a resident of the State of Florida and was not served with process therein.

We may assume that if the alleged domicile of Mrs. Ward in Florida were genuine, our statutory limitation upon the credit to be given the Florida decree would be impaired by the decision of the United States Supreme Court in *Williams v. North Carolina,* 317 *U. S.* 287, 87 *L. Ed.* 279 (1942). But the Florida decree went, and could go, no further than to grant a divorce. No provision of the federal constitution and no decision of the United States Supreme Court impels the State of New Jersey to augment that decree by charging alimony against Dr. Ward. *Cf. Estin v. Estin,* 334 *U. S.* 541, 92 *L. Ed.* 1561, 68 *Sup. Ct.* 1213 (1947) ; *Kreiger v. Kreiger,*

334 *U. S.* 555, 92 *L. Ed.* 1572, 68 *Sup. Ct.* 1221 (1947). The only authority for such a charge is the New Jersey statute, *R. S.* 2:50–37, *supra*. That statute, by our interpretation, does not grant authority for awarding alimony when the decree of divorce upon which the application is rested was obtained in another state, as was this one, under conditions contrary to the provisions of *R. S.* 2:50–35, –10 and –11.

■ Section 35 (formerly section 33 of the Divorce Act, *ch.* 216, *P. L.* 1907) declares the public policy of this State toward divorces obtained in another state, *Giresi v. Giresi*, 137 *N. J. Eq.* 336 (*E. & A.* 1945). It is not to be construed as denying recognition to a divorce decree of a sister state upon the sole ground that the party in whose favor it was entered had not resided in that state for a period of two years, *Sleeper v. Sleeper*, 129 *N. J. Eq.* 94 (*E. & A.* 1940); nevertheless, the combination with other elements already named contrary to the provisions of the section will result in depriving the decree of force or effect in this jurisdiction, *Lawler v. Lawler*, 2 *N. J.* 527 (1949); *Mascola v. Mascola*, 134 *N. J. Eq.* 48 (*E. & A.* 1943); and in saying this we are limiting the application of it to the construction of our statute on alimony.

■ Further, Mrs. Ward was in no position to ask for alimony in our Court of Chancery for the reason that she came with unclean hands, the ground upon which, in effect, her application for counsel fees and costs was denied; with knowledge of that court's injunction, and in spite of it, she proceeded to take her Florida decree; *Kempson v. Kempson*, 61 *N. J. Eq.* 303, 327 (*Ch.* 1901), affirmed and modified in other respects, 63 *N. J. Eq.* 783 (*E. & A.* 1902), which, in this aspect, we think was not overruled by *Sherrer v. Sherrer*, 334 *U. S.* 343, 92 *L. Ed.* 1429 (1947), because Dr. Ward did not appear or participate in the Florida suit. *Cf. Hyams v. Old Dominion, &c., Co.*, 82 *N. J. Eq.* 507, 517 (*Ch.* 1913). That is true independently of whether the final judgment in the injunction suit adjudging that the Florida decree was of

no force or effect in this State is void as lacking procedural due process—a question which we shall presently discuss.

It has been the established rule in this State that upon marriage the domicile of the wife merges into that of her husband, as a legal sequence of the nuptial contract, and that this unity of domicile, called the matrimonial domicile, exists during coverture unless the wife acquires one elsewhere by the husband's consent, manifested by acquiescence, or aban-donment, or by his *delictum*. *Rinaldi v. Rinaldi*, 94 *N. J. Eq.* 14 (*Ch.* 1922); *Thompson v. Thompson*, 89 *N. J. Eq.* 70 (*Ch.* 1918); *Floyd v. Floyd*, 95 *N. J. Eq.* 661 (*E. & A.* 1924); *Heimler v. Heimler*, 129 *N. J. Eq.* 497 (*E. & A.* 1941). In *Peff v. Peff*, 2 *N. J.* 513 (1949), the husband changed his domicile, and we held that he had a right to do so provided, as was the circumstance there, the change was *bona fide;* but that procedure, it will be observed, is not a variance from the terms of the rule. A *feme covert's* residence follows that of her husband although it may terminate with the reason upon which it rests, *Tracy v. Tracy*, 62 *N. J. Eq.* 807 (*E. & A.* 1900); a distinction which is elaborated, in consonance with the rule, in *Heimler v. Heimler, supra*, at *p.* 499. The rule, referred to above as the established rule, is not drawn from our statutes. It is of long standing, of wide acceptance and has its basis in the common law. *Cf. Story on Conflict of Law, 7th Ed.*, §§ 46, 136. In the absence of pleading or proof as to the applicable foreign law, it will be presumed that the common-law principles prevail. *R. S.* 2:98–28; *P. L.* 1942, *c.* 104; *Kelly v. Kelly*, 134 *N. J. Eq.* 316 (*Prerog.* 1944). The Florida law thereon was not pleaded or proved and we therefore assume that it is the same as our own; which strengthens our belief that the suit was a fraud upon the courts of that state.

Our finding upon all of the facts is that Mrs. Ward did not establish a *bona fide* domicile in Florida, that she did not have the legal capacity to establish a domicile there, that, assuming she had the legal capacity, she did not have the *animus non revertendi* to New Jersey and that her action was

in fraud of the Florida courts and of our courts. *Williams v. North Carolina,* 325 *U. S.* 226, 89 *L. Ed.* 1577, 65 *Sup. Ct.* 1092 (1944); *Giresi v. Giresi, supra; Esenwein v. Pennsylvania,* 325 *U. S.* 279, 89 *L. Ed.* 1608, 65 *Sup. Ct.* 1118 (1944); *Peff v. Peff, supra.*

As to whether the final judgment in the injunction suit was void as lacking procedural due process:—Mrs. Ward was regularly in court under the original injunction bill and had been duly served with the injunction. She had actual knowledge of the amendatory supplement. We interpolate to say that while the hearing upon which the injunction was granted was *ex parte* it is clear from the proofs taken on the application for alimony and on Dr. Ward's divorce action, wherein Mrs. Ward appeared and testified, that her procedure in Florida was, in legal terminology, a fraud upon the courts of that state and of this State and upon Dr. Ward and that had she appeared in the injunction suit and testified as she testified later, the injunction would, with assurance, have issued just as it did issue; in other words, that the proceeding, although *ex parte* because of Mrs. Ward's withholding herself, did not move with injustice to her.

The amendment was in sequence to, was consequent upon and was in completion of the original bill. It sought to avoid that which Mrs. Ward by her disobedience had accomplished. The procedure was in conformity with the prevailing practice in this State in similar divorce cases.

█ It is said that a bill for injunction is *in personam* and does not act directly on the subject matter of the litigation, whereas the amendment was *quasi in rem,* that there was no marriage at the time it was filed and that a judgment therein could not affect the marriage status; and, further, that no personal jurisdiction was obtained. According to our cases the injunction proceeding was *quasi in rem* from its inception, and notwithstanding its status as *in rem,* notice to Mrs. Ward of the injunction was enough to make it obligatory upon her. *Kempson v. Kempson, supra.* Chancery had jurisdiction; this, as was held in the cited case, upon the principle that the

marriage has a *silus* within the State arising from the fact that the matrimonial domicile and the domicile of the complaining spouse were here, no matter where the other spouse might be. It was further said in the *Kempson case* that while notice of the injunction is sufficient to bind the defendant living outside of the State there must be appearance by the defendant, or process served within the State, or *publication of notice,* for the purpose of pronouncing a decree in the cause. To focus the proofs upon precisely what was done by way of bringing Mrs. Ward into court, we quote from the stipulation of counsel (italics inserted) :—

"On April 27, 1948, Albert J. Ward filed a bill in the Court of Chancery of New Jersey (Docket 162/435) to enjoin the prosecution by Marilyn S. Ward of her Florida divorce proceeding which was commenced by her on April 14, 1948. Notice of this suit was given by registered mail to her and to her Florida attorney as provided by orders made in that cause, and like notice was given both of all subsequent proceedings therein. *She was brought in by publication and substituted service of process.* A stay and (subsequently) an injunction were issued in the injunction suit and served on her in Florida."

From this it is made certain that not only did Mrs. Ward have notice of the injunction but that she was actually brought in, under her husband's bill in Chancery, by publication and substituted service of process. An argument *contra* is made in reliance upon *McGuinness v. McGuinness, 72 N. J. Eq. 381 (E. & A. 1906),* and *Armour v. Armour, 142 N. J. Eq. 337 (E. & A. 1948).* The distinctions are obvious. The *McGuinness case* concerned a decree directing payment of alimony against an absent defendant. It has been generally held since *Pennoyer v. Neff, 95 U. S. 714, 24 L. Ed. 565 (1877),* that an award of alimony is void against a defendant who has not been served with process within the territorial limits of the state and has not entered an appearance in the suit. In the *Armour case,* under an earlier decree (same title) reported in *135 N. J. Eq. 47 (E. & A. 1944),* the court determined that Mrs. Armour was justified in living separately

from her husband, and allowed her substantial maintenance moneys. By virtue thereof, and in accordance with our law, she was entitled to set up a separate domicile, and that she did, in the State of New York. It may not accurately be said that where the wife, under court separation, has established a domicile in another state the husband's domicile is the matrimonal domicile. Consequently, New Jersey was not the matrimonial domicile, and the theory of an action *in rem* fell. Moreover, the service by which the husband sought to proceed in the *Armour case* was the mere leaving of a paper at the office of the wife's attorneys.

All of the litigation from the beginning until now has been of a piece. The parties were born and bred in New Jersey, resided here, were married here and had their marriage domicile, including actual physical presence, here. The wife, for no reason recognized by our law, wanted a divorce and alimony thereunder from her husband. Unable to fulfill her design in this state, she went to Florida with the purpose of getting there what she could not get here, namely, a divorce; and of then getting here what she could not get there, namely, continuing support from the man whom she sought to divorce. That plan was interrupted by the New Jersey proceedings under the bill for injunction. The suit had but one purpose, and that was to thwart Mrs. Ward's unlawful objective. She flouted the injunction order and took her decree. The next step was to avoid that which she had unlawfully done.

The amendment and the order under which it was filed and served are not before us. All that we have in the record by way of proof of their content is the stipulation of counsel, which, for precision, we quote:—

"She disobeyed the injunction and proceeded to secure a decree for divorce in her Florida action on June 14, 1948. On September 14, 1948, an amendment by way of supplement to the bill in the injunction suit was filed, setting up the fact that Mrs. Ward had, contrary to the command of the injunction, proceeded to take a decree for divorce in the Florida court, and praying that said decree be adjudged to be of no force and effect in this state. Mrs. Ward and her Florida attorney were again given notice by registered mail

of the amendment, and accorded time within which to answer. All the papers required to be mailed to her and her attorney in Florida were duly mailed in accordance with the orders made in that cause and the practice of the former Court of Chancery."

Thus we have it stipulated by counsel that what was done was the filing of an amendment to the bill, an amendment by way of supplement to be sure, but nevertheless an amendment; and it was, in effect, just what it was nominated, an amendment; no new parties, no really new issues, simply an amendment to recite what the wife had meanwhile done in violation of the proceedings theretofore had, acts the significance of which she was fully aware when she did them. The amendment took on the form of a supplement because technically nothing can be actually incorporated in a bill which arose subsequently to the commencement of the suit; but the difference between a technical supplement, made under such circumstances and before the defendant has appeared, and an amended bill is only nominal. The stipulation regarding notice is amplified by proofs which demonstrate to our satisfaction that both the amendment by way of supplement and the order permitting the filing of the same were received by the attorney on September 18, 1948, and by Mrs. Ward on September 28, 1948. Mrs. Ward was in court under the original bill and she was on full knowledge of the amendment by way of supplement, with ample opportunity to appear and contest. In *Equitable Life Assurance Society v. Laird,* 24 *N. J. Eq.* 319 (*Ch.* 1874); affirmed, 26 *N. J. Eq.* 531, *sub nom. McCahill v. Equitable Life Assurance Society,* 26 *N. J. Eq.* 531 (*E. & A.* 1875), an amendment bringing in new parties with incidental allegations was held not to require the issuing of a new subpoena against a nonappearing defendant.

The making of the further allegations and prayer may, with technical accuracy (*Chancery Rule* 64), be termed an addition by way of supplement to the original bill, service of copies of which addition was made on the sole defendant, already brought in by publication and substituted service of process as a party in the cause. The procedure was in compliance

with *Rule* 64 of the former Court of Chancery and with present *Rules* 3:15–3 and 3:15–4.

The amendatory pleading came, in our opinion, within the rule that where new matters grow out of and are connected with the same transaction in which the litigation arose, and are germane to the object of the suit, it is proper to present them by a supplemental pleading, although the appropriate form of relief may be different; 2 *Daniell Ch. P. & P.* (*6th Amer. Ed.*) *1516, and notes; *Rio Grande Dam & I. Co. v. United States,* 215 *U. S.* 266, 54 *L. Ed.* 190 (1909); *Bethlehem Fabricators, Inc., v. H. D. Watts Co.,* 190 *N. E.* 828 (*Mass. Sup. Jud. Ct.* 1934); *Williams v. Winans,* 22 *N. J. Eq.* 573 (*E. & A.* 1871); *Bartlett v. N. Y., N. H. & H. R. Co.,* 226 *Mass.* 467, 115 *N. E.* 976 (*Mass. Sup. Jud. Ct.* 1917). Consequently, the final judgment in the injunction suit was not lacking in procedural due process. On the contrary it stands as *res judicata* of the invalidity of the Florida decree.

Matrimonial suits are in some respects *sui generis.* Their reflex consequences are rooted deeply in the home, in society and in human relations generally. They ought not be permitted to take on the aspects of a game wherein wits, speed, daring and finesse prevail over elemental right and justice. Divorces and their incidents have become little less than a national scandal. The efforts of most of the states to maintain equilibrium in the marital status and responsibilities of their domiciliaries are shockingly thwarted by the liberal provisions of a few jurisdictions, known as "easy divorce" states, and by the facility with which, under prevailing conditions, the laws of more conservative jurisdictions, such as our own state, are mocked. Let us consider the philosophy of the instant case:—The wife, without justification, departs to another jurisdiction long enough to get a decree which by no skill or deception could be got here and forthwith returns with impudent effrontery to bring suit, relying upon the argument that the due faith and credit which are owing to the decree of another state should be linked with our own laws enacted

to protect a deserving wife against·an erring husband. Upon that reasoning she demands that the husband, having been wrongfully subjected to a broken home, shall further respond in considerable and continued maintenance payments. Thus, *in absentia,* one of our citizens, blameless by our·standards, is gripped by the legal machinery of a state where he never has been and never expects to be, against which and against the citizens of which he had never sinned, where he is not known, and therefore where the asset of a life well lived and of a merited place in the community loses its value. The suit is instituted in a far state, going to which on an errand of this sort would of itself be an unreasonable burden; but in addition the husband does not dare to appear there either in person or by attorney because in so doing he yields to the jurisdiction. The inequity and the iniquity of such a situation should, if possible, be relieved. There are ample grounds for granting relief in this case.

For the reasons stated, we find that the judgment of the Superior Court was soundly reached; that Mrs. Ward not only did not, but under the facts of the case was without capacity to, establish a *bona fide* domicile in the State of Florida; that the Florida suit was a fraud upon the courts of that state and of this State; that by reason thereof the courts of that state did not have jurisdiction to entertain the suit and that the decree of divorce there granted was null and void and of no force or effect in this State; that the judgment in the injunction suit to that effect is *res judicata* thereof; that Mrs. Ward in her contempt of our Court of Chancery came with unclean hands in that she had knowingly and deliberately disobeyed the injunction issued therefrom and sought to profit by her disobedience; that in any event she was not entitled to alimony under *R. S.* 2:50–37 because her course had not conformed to the public policy of this State as set forth in *R. S.* 2:50–35 and related sections; that her application for alimony should be dismissed and that Dr. Ward's petition for divorce should be granted, with a decree *nisi.*

Our conclusions stated above lead to a reversal of the judgments in the Appellate Division. The judgment *nisi* awarded to Dr. Ward in the Superior Court, Chancery Division, is affirmed, without costs or other allowances. Mrs. Ward's suit for alimony will be dismissed, also without costs or other allowances.

*For reversal*— Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, BURLING and ACKERSON—5.

*For affirmance*—Justices HEHER and WACHENFELD—2.