88 N.J. Super. 291 (1965)
212 A.2d 171
GEORGE G. SALMON, JR., PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
CHRISTINE FERGUSON SALMON, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 1, 1965.
Decided June 25, 1965.
*294 Before Judges GOLDMANN, SULLIVAN and LABRECQUE.
Mr. William Rossmoore argued the cause for respondent and cross-appellant (Messrs. Stavis, Richardson, Koenigsberg & Rossmoore, attorneys).
Mr. Benjamin M. Ratner argued the cause for appellant and cross-respondent (Mr. Lawrence Friedman, on the brief).
*295 The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant wife appeals and plaintiff husband cross-appeals from a Chancery Division judgment determining the respective rights of the parties after the wife had obtained an ex parte divorce in Nevada, the husband not having been personally served and not having answered or appeared. The main issues concern the custody of the three younger children of the marriage, alimony and support.
Since defendant relies upon the applicability of the full faith and credit clause to the Nevada judgment, and because of our determination of the custody and alimony issues, some detailing of the background facts is necessary.

I.
The parties were married in 1945 and lived together in New Jersey until defendant left at the end of 1961. Five children were born of the marriage: Nancy (1946), Albert (1948), Christopher (1951), William (1953), and Sally (July 21, 1961). The marriage was apparently uneventful until February 1961 when defendant sought psychiatric help from Dr. Roland Roecker. Her complaint was that her husband was mentally ill. As a result, Dr. Roecker also saw plaintiff and came to the conclusion that it was the wife who was mentally ill and not the husband. His diagnosis was that defendant was suffering from paranoia schizophrenia. In August 1961 she came under the care of another psychiatrist, Dr. Richard W. Taylor. He arrived at the same diagnosis, as did his wife, Dr. Joan K. Taylor, a clinical psychologist.
In July 1961 defendant had asked her husband to sign papers she had prepared and which provided that she would leave with the children if he would give her a small amount of money. She pressed this proposal for almost a month, but he refused to sign. After the birth of the last child, Sally, on July 21, 1961 defendant left by automobile for a month's trip, taking the newly born infant with her to Bucks County *296 in Pennsylvania, Boston, Lake Champlain, back to Boston, and then home to New Jersey.
Thereafter, in September 1961, defendant's then attorney held a conference at which defendant, her father, plaintiff and a stenographer were present. The discussion centered upon the living arrangements of the parties while the wife underwent psychiatric therapy. It was concluded that plaintiff would leave the marital home in Short Hills, but would continue his pediatric practice in the office part of the house. This temporary arrangement had been suggested by Dr. Roecker for the benefit of the wife, and this with the approval of Dr. Richard Taylor. Plaintiff reluctantly accepted the arrangement and went to live with his parents in nearby Millburn, while the five children stayed with their mother. After about a month defendant sent Nancy, the oldest child, to live with plaintiff. Then, in mid-November, she sent the oldest boy, Albert, to California, despite plaintiff's objections.
It was at about this time that defendant decided to discontinue her course of treatments with Dr. Richard Taylor. Soon after, in early December, defendant told her husband that if he were successful in obtaining the children, she would kill them all. It was during this period that plaintiff observed his wife sitting in the living room of the house with a gun across her lap. He later found the gun, a loaded .22 rifle, in her room, removed the bolt to render it inoperable, and left the bolt with the Millburn police. His wife repeatedly thereafter asked for the return of the bolt; she even wrote him for it in February 1962, after she had left New Jersey.
About Christmas 1961 plaintiff moved back into the matrimonial home, informing defendant that he had returned to resume a normal family life. Her reply was that she would not live there with him, and if he insisted on remaining in the home she would live in the office. She proceeded to carry out her threat, moving plaintiff's office equipment into the living quarters of the home, her bedroom furniture into the office, and the kitchen equipment into the laboratory. The situation, described as "chaos" by a mutual friend, made it impossible *297 for plaintiff to carry on his practice. After one night in the house he had to move out. Two days later, on December 29, without warning or consultation with her husband, defendant left the marital home and the State, taking the three younger children with her.
For about three months after his wife's departure plaintiff had no knowledge of her whereabouts. He would write her, but always through a forwarding address which would shift between her brother's address in Pittsburgh, Pennsylvania, and her sister's address in Lafayette, California. Plaintiff first learned that she was in Nevada in March 1962, when he was served with papers in a divorce action she had instituted in that state. He and the oldest child, Nancy, had meantime moved back into the Short Hills home on January 5, 1962. Shortly thereafter, and at the request of his son Albert, plaintiff flew to California and brought the boy back to live with him.
Defendant described her own activities during these months as follows. In November 1961 she bought a new car although her husband had refused consent, paying for it with borrowed money and later repaying the loan by selling stock which belonged to both parties jointly. Before leaving New Jersey in this car she had already come to a tentative decision to make Nevada her home. She chose that state because "I wanted to live under the laws of Nevada"; she thought Nevada would be "fair" to her with respect to getting a divorce and custody of the children. Her plan was to go to Pittsburgh first for two or three weeks, which she did, placing the children in school there. She then took them out of school and went to California for a weekend. From there she took the children to Reno for a few days, and then to Carson City, Nevada, where they all lived for some six months under the assumed name of "Sanderson." She said her reason for the assumed name was to forestall "kidnapping." It was during this Carson City period that the parties exchanged correspondence through the wife's Pittsburgh and California forwarding addresses. In his letters plaintiff expressed his continuing affection for defendant *298 and assured her that the Short Hills home was open for her return. She wrote that she would not return.
Soon after defendant had left the marital home, and on January 15, 1962, plaintiff instituted the present action for custody and an accounting. This was before defendant instituted her Nevada divorce proceedings. Upon learning of defendant's whereabouts by reason of having been served with the Nevada divorce papers, plaintiff filed an amended complaint on March 28, 1962, adding a count for injunctive relief to restrain his wife from further legal proceedings in Nevada affecting the marriage or custody of the children. He also obtained an order to show cause returnable April 12, containing a temporary restraint. Defendant was served with this order in Nevada on April 2, 1962, the very day she obtained an ex parte divorce decree from the Nevada court. (Although she testified that the paper was served some hours after the decree, we have nothing more than her word in support.) A pendente lite order to the same effect as the restraining order of March 28 was entered in this proceeding on April 12, 1962 and served on defendant in Nevada on May 8 following.
A further order, directing defendant to show cause why plaintiff should not be granted custody of the three younger children pending final hearing, was issued on April 23 and served on defendant in Nevada on May 8. The order temporarily awarded custody of the three children to plaintiff. This relief was continued pendente lite on May 17, 1962. Although defendant received a copy of the latter order by mail in Nevada later that month, and was personally served with it in New Jersey in February 1963 when she appeared at the Chancery Division hearing, she never complied with the order.
It was not until November 5, 1962 that defendant appeared in this proceeding and was permitted to file an answer and counterclaim seeking a declaration of the validity of her Nevada divorce, support for herself and the three younger children, custody of the two older children, and certain other *299 relief with respect to property. (Her claim for custody of the two older children was abandoned during the trial.)
The matter came on for full hearing before the Chancery Division judge in February and March 1963. At the outset of the trial plaintiff moved that defendant be held in contempt for failure to comply with the custody order of May 17, 1962. Following the hearing the trial judge rendered an extensive oral opinion. Final judgment thereon was entered April 24, 1963, determining, among other things, that
(1) Defendant's Nevada divorce was entitled to full faith and credit "insofar as it effects the dissolution of the marriage of the parties."
(2) The Chancery Division had jurisdiction of the issue of custody of the three younger children, and awarded custody to defendant.
(3) Plaintiff was to pay defendant $300 monthly alimony for herself, and support of $150 a month for each of the three children in her custody.
(4) Defendant was not entitled to retroactive support and alimony in the approximate amount of $13,500.
(5) Defendant was not entitled to ownership of two Arabian horses allegedly given her by plaintiff.
(6) Plaintiff was to have visitation rights with the three younger children during the summer vacation months, he to determine the time and place for such visits and to furnish the means of transportation; and defendant was to have liberal visitation rights with the two older children.
(7) Plaintiff's motion to hold defendant in contempt for failure to comply with the May 17, 1962 custody order should be denied.
Defendant appealed from those parts of the final judgment which determined that the Chancery Division had jurisdiction of the issue of custody of the three younger children, and fixed plaintiff's visitation rights. She subsequently amended her notice of appeal to challenge the adequacy of the alimony and support allowed, the denial of her claim to reimbursement of the $13,500, and the determination regarding the Arabian horses. Plaintiff, in turn, cross-appealed from those parts of the judgment which accorded full faith and credit to the Nevada divorce, granted defendant custody of the three younger children, awarded alimony and support, and denied his motion to hold defendant in contempt for failure to comply with the May 17, 1962 custody order.
*300 Plaintiff has abandoned his appeal from the determination according full faith and credit to Nevada's ex parte dissolution of the marriage because he finds himself unable to dispute the sufficiency of defendant's residence in that state to accomplish that limited result.
On June 14, 1963 this court, on plaintiff's application, entered an order staying so much of the final judgment as awarded defendant alimony, pending determination of the appeal and cross-appeal.
On July 26, 1963 the Chancery Division adjudged defendant in contempt for failure to comply with the visitation provisions of the final judgment, and suspended the award of alimony and support until such time as she purged herself of the contempt and granted plaintiff his visitation rights.

II.
Defendant's main argument is addressed to the claim that the Chancery Division did not have jurisdiction to deal with the custody of the three younger children because (1) they were not physically present or domiciled in New Jersey, and (2) Nevada had awarded her custody and control of the children, who were present in that state at the time of the decree.
We have already noted that plaintiff was not personally served in Nevada and did not answer his wife's divorce complaint or appear. The Nevada decree alleged, without specification, that he had treated her "with extreme cruelty." Finding that the three younger children were within the jurisdiction of the court and subject to its award of custody, the decree stated that "this court finds that the plaintiff [defendant here] is a fit and proper person to have the care, custody and control of these three minor children and that the defendant [plaintiff here] should be ordered to pay a reasonable amount for child support but this court having no jurisdiction over the defendant reserves jurisdiction thereof." The decree further recited that the court "specifically reserves *301 jurisdiction over all matters of alimony, support, custody, visitation privileges, property rights and other matters not covered herein."

A.
We hold that the trial judge was correct when he found that New Jersey had jurisdiction to deal with the custody issue. The divorce and custody aspects of the Nevada decree are separable. In May v. Anderson, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953), the parties had married and were domiciled in Wisconsin. After marital troubles had developed, they agreed that the wife would take the children to Ohio and there think over her future course. When she later informed her husband that she was not returning to Wisconsin, he brought suit there for divorce and custody. The wife was personally served in Ohio. (The Wisconsin statute authorized such service for divorce purposes, but there was no provision for such service in custody proceedings.) The wife did not appear or contest the action. The Wisconsin court granted the husband divorce and custody. He then went to Ohio and took the children back to Wisconsin. Some time later he brought the children to Ohio and permitted them to visit with their mother. When he demanded their return, she refused to surrender them. He then petitioned for a writ of habeas corpus in Ohio, relying on the Wisconsin decree. The United States Supreme Court said:
"Separated as our issue is from that of the future interests of the children, we have before us the elemental question whether a court of a state, where a mother is neither domiciled, resident nor present, may cut off her immediate right to the care, custody, management and companionship of her minor children without having jurisdiction over her in personam. Rights far more precious to appellant will be cut off if she is to be bound by the Wisconsin award of custody.
`[I]t is now too well settled to be open to further dispute that the "full faith and credit" clause and the act of Congress passed pursuant to it do not entitle a judgment in personam to extra-territorial effect if it be made to appear that it was rendered without jurisdiction over the person sought to be bound.' [Citations omitted]" (345 U.S., at page 533, 73 S.Ct. 840) *302 The court held that the mother's custody right was entitled to as much protection as in the case of a claim for alimony, citing Estin v. Estin, 334 U.S. 541, 68 S.Ct. 1213, 92 L.Ed. 1561 (1948). In that case the court had said:
"* * * The fact that the requirements of full faith and credit, so far as judgments are concerned, are exacting, if not inexorable * * *, does not mean, however, that the State of the domicile of one spouse may, through the use of constructive service, enter a decree that changes every legal incidence of the marriage relationship." (334 U.S., at page 546, 68 S.Ct., at page 1217)
The Estin court held the divorce divisible  it gave effect to the Nevada decree insofar as it affected the marital status, but made it ineffective on the issue of alimony. Id., at page 549, 68 S.Ct. 1213. For a discussion of May v. Anderson, see Ratner, "Child Custody in a Federal System," 62 Mich. L. Rev. 795, at page 803 et seq. (1964).
In our case, defendant took the children out of New Jersey without plaintiff's knowledge or consent. She started her Nevada divorce action, serving defendant in New Jersey. Nevada Rule of Civil Procedure 4(e) (2) allows personal service outside the state in any action "affecting specific property or status." The Nevada court had one party (defendant) and the children before it. There is no dispute now, at least prima facie, as to the bona fides of defendant's claimed domicile in that state. The Nevada court had jurisdiction to deal with the marital bond, and full faith and credit must be, as it has been, given to the decree insofar as it dissolved that bond. Williams v. North Carolina (I), 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942).
Thus, even though the Nevada court found that it had jurisdiction as to custody, its award of custody was not entitled to full faith and credit in New Jersey in the light of May v. Anderson, above. And see Casteel v. Casteel, 45 N.J. Super. 338, 344 et seq. (App. Div. 1957), where Judge Conford fully explored the question as to when the judgment of a sister state adjudicating custody of a minor child is entitled to full faith and credit under the United States Constitution.

*303 B.
There is a second approach to this matter. The record is bare of any evidence in the Nevada proceedings dealing with the welfare of the children in question  there is nothing to show the basis on which the Nevada court made its custody award. It undoubtedly gave the children into the care of the mother because all four were then in that state. The court could not possibly have had before it all the information adduced or that could be adduced in our courts, e.g., plaintiff or defendant's fitness to have custody, the relative means and resources of the parties, the Short Hills home environment, and most particularly, defendant's psychiatric and psychological background and the history of her actions during the months preceding her departure from New Jersey. Plaintiff, as we have observed, was not served in Nevada and took no part in the proceedings there. On the other hand, both parties were before the Chancery Division when it assumed jurisdiction of the custody issue. The fact that the younger children were not in New Jersey was therefore no reason for the Chancery Division staying its hand.
Although the Nevada judgment was entitled to full faith and credit here insofar as its divorce aspect was concerned, this did not require that our courts attach greater finality to the custody adjudication than Nevada would have. Under the Nevada statute the courts there may at any time after final hearing and during the minority of any child of the marriage make such order for the custody, care, education, maintenance and support of the child as may seem necessary or proper, and "may at any time modify or vacate the same." Nev. Rev. Stats. 125.140(2). We therefore conclude that upon application, the Nevada court, under local law, could and undoubtedly would have reconsidered the custody question on the basis of the extensive and clearly material proofs which we have recited, all bearing upon the welfare of the children, and which were not presented to that court at the original hearing. With such proofs before it, the Nevada court would have *304 acted when both parties had submitted to the jurisdiction, even though the children involved were not residents of that state. Wilson v. Wilson, 66 Nev. 405, 417-419, 212 P.2d 1066, 1072 (Sup. Ct. 1949). What Nevada could do in modifying a custody award, our courts may do. Cf. People of State of New York ex rel. Halvey v. Halvey, 330 U.S. 610, 614, 67 S.Ct. 903, 905, 91 L.Ed. 1133, 1135 (1947), discussed by Ratner in 62 Mich. L. Rev., above, at page 799 et seq.; Casteel v. Casteel, above, 45 N.J. Super., at pages 350-352.

C.
Finally, our own parens patriae responsibility compelled the Chancery Division judge to assert jurisdiction of the question of custody. It must not be forgotten that the parties had married in New Jersey and for years made their matrimonial home in this State. Their children were born here. When defendant took the three younger children and left for other parts, she did so in clear violation of our statutes, expressive of our policy concerning the removal of minor children of divorced or separated parents. N.J.S.A. 9:2-2 provides:
"When the Superior Court has jurisdiction over the custody and maintenance of the minor children of parents divorced, separated or living separate, and such children are natives of this State, or have resided five years within its limits, they shall not be removed out of its jurisdiction against their own consent, if of suitable age to signify the same, nor while under that age without the consent of both parents, unless the court, upon cause shown, shall otherwise order. * * *"
Again, N.J.S.A. 9:2-4 states that
"* * * in no case shall the court having jurisdiction in this State over the person and custody of any minor permit such child to be removed from this State where the mother or father resides in this State and is the suitable person who should have the custody of such child for its best welfare."
*305 This legislation, dating from 1902 (L. 1902, c. 92), supplements our parens patriae jurisdiction. Fantony v. Fantony, 21 N.J. 525, 535 (1956). Before the mother acted there could be no question that the children had the same domicile as their father. Edwards v. Edwards, 8 N.J. Super. 547, 550-551 (Ch. Div. 1950), and cases cited. In light of our public policy, evidenced by the cited statutes, we question whether defendant could willfully change that status, absent the father's consent or a matrimonial offense on his part justifying her acquiring another domicile. (Here we again specially note that plaintiff immediately instituted his action for custody upon learning of his wife's departure, sometime before she had established herself in Nevada and instituted divorce proceedings there.)
Although the Nevada decree may bind the parties themselves insofar as dissolution of the marriage bond is concerned, it cannot bar our courts from the performance of their statutory duty where the children are concerned. Children have always been the special concern of our courts; as to them, the obligation of independent inquiry and determination is inalienable and supervening. As was said in Casteel, above,
"Every state is entitled to enforce in its own courts the policy of its own statutes on subjects properly the incidents of its jurisdiction, and the full faith and credit clause of the United States Constitution does not require otherwise unless the conflicting statute or judgment of another state is shown, on some rational basis, to have a superior basis for recognition." (45 N.J. Super., at page 354)
Mr. Justice Frankfurter, concurring in May v. Anderson, above, 345 U.S., at page 536, 73 S.Ct., at page 844, said that "the child's welfare in a custody case has such a claim upon the State that its responsibility is obviously not to be foreclosed by a prior adjudication reflecting another State's discharge of its responsibility at another time."
We therefore conclude that the existence of the Nevada decree did not deprive our Chancery Division of jurisdiction to render a custody award binding on defendant.

*306 III.
We pass to plaintiff's contention that the Chancery Division judge erred in awarding custody of the three younger children to defendant. We start with the familiar proposition that the criterion for an award of custody is always what would be in the best interests of the child. Armour v. Armour, 135 N.J. Eq. 47, 51 (E. & A. 1944); R.S. 9:2-4. In determining how custody shall be awarded, the court will consider the personal safety, morals, health, general welfare and happiness of the child, and will satisfy itself as to the character, conditions, habits and the surroundings of the respective parents. Clemens v. Clemens, 20 N.J. Super. 383, 392 (App. Div. 1952). Each case must rest on its own facts. Although courts generally award custody of a child of tender years to the mother, there is nothing in our cases which suggests that she is automatically entitled to custody regardless of all other factors established by the record.
In his oral opinion, the trial judge noted that the children were then 11 1/2, 9 1/2 and 1 1/2 years old, respectively; that they had been in defendant's care since the end of 1961, a period of about 15 months, and that defendant had testified that the children were happy with her. The main problem, as the judge saw it, had to do with the mother's mental condition; whether the findings of the doctors would prevent her from being considered a fit mother, and also whether the children would be safe in her custody. He frankly stated that he was disturbed by several matters: (1) the testimony that defendant had been seen by plaintiff with a rifle on her lap, that he took the bolt from the rifle, and she requested its return; (2) defendant's leaving New Jersey without a court order and without the husband's consent; (3) the fact that she had travelled about with her very young child for a time; (4) her actions in moving household furniture into plaintiff's professional office, "which would certainly be an unusual type of action"; (5) her use of an assumed name in Nevada because of an alleged fear of kidnapping; and (6) her "tremendous *307 claim" for support, which far exceeded plaintiff's income. (She asked $519.10 a week for the support of herself and the three children, or $26,993 a year, as against her husband's gross income before taxes, evidenced by income tax returns which she said were substantially correct, of $13,345, $13,748 and $16,609 for the years 1960, 1961 and 1962, respectively.)
As against this the judge considered only the conclusion reached by Dr. David J. Flicker that "judging from all of the factors that the patient has told me * * * there may be some question as to the acuity of her judgment, but lack of good judgment, fortunately, does not constitute psychiatric disease. At this time, I am unable to arrive at any psychiatric diagnosis. I see no contra-indication to this patient carrying out the usual activities of a housewife and mother." The judge concluded that "even though [defendant's] background is bad," the children's welfare would best be served by awarding custody to her, with reasonable visitation rights accorded plaintiff. The custody order, he said, "still can be revised at any time in the future." The judge also said that he was "tremendously" bothered by the distance separating the parents, the fact that the family would be split up, and the further fact that plaintiff had a "perfectly fit home to keep these children in."
In our view, the trial judge placed too great a reliance upon Dr. Flicker's opinion (we note particularly his inability to arrive at any psychiatric diagnosis) and disregarded the testimony of Dr. Roecker, Dr. Richard Taylor and Dr. Joan Taylor. Dr. Flicker had interviewed defendant for "something over an hour." Although he spoke of her reciting certain "pertinent factors" which led him to his conclusion, he did not record them. He did not examine her physically or give her any of the basic tests necessary to a considered opinion. The fact that she had been diagnosed as a paranoic schizophrenic in 1961 made no difference to him at the time of his interview with her.
Contrast with this the extended examination and treatment given defendant in 1961 by the Drs. Taylor and Dr. Roecker, *308 all of whom arrived at a diagnosis of paranoia schizophrenia. Dr. Joan Taylor found defendant's condition to be chronic and of long standing. She said that defendant was unable to deal with emotional situations; "it would seem hopeless to think of therapy as affecting any major changes in her personality." Pushed too hard, she might "suddenly and without warning bolt." Dr. Richard Taylor also found defendant's condition of long-standing origin. Such a condition "would affect a person's judgment in any matter unpredictably, including the care of the children." Dr. Roecker, when asked what the likelihood was of defendant's having been cured of her condition, since she had had no treatment since 1961, replied: "The probabilities without treatment are not too favorable for a complete cure."
The report of investigation made by the county probation department under R.R. 4:98-8, dated July 9, 1962, stated that plaintiff's home was certainly adequate, and the two older children who were with him had adjusted well to the situation. Defendant's home in Nevada was of an unknown quality, and although a report received from the Nevada Department of Parole and Probation indicated that the younger children had made a good adjustment, this information was not verified. We have examined the report and find that the letter sent to the chief probation officer by the Nevada department was not based upon direct personal investigation of defendant, the children or their home. A second report, received from the chief probation officer in Pittsburgh, is completely uninformative.
Our examination of the entire record convinces us that the matter will have to be remanded to the Chancery Division for a reconsideration of the custody question. In our opinion, the trial judge did not have sufficient information upon which to base his award. There should be a complete psychiatric and psychological examination of defendant and, in fairness, of plaintiff also. Information regarding the Short Hills home environment and the condition and adjustment of the two older children should be brought up to date. Similarly, *309 there should be an investigation into the Nevada situation  defendant's present Reno home and environment, her habits and activities, the care and education the younger children are receiving, their adjustment, etc. This should be based on personal interviews with defendant and the children, as well as with neighbors who have direct knowledge of the situation.
If, following such a comprehensive check, the trial judge is satisfied that the younger children should be left with the mother, the award of custody should be on terms. It is clear from her testimony that regardless of what our courts do, she intends to remain in Reno and hold onto the children, relying upon Nevada law, which she has found to her liking, to protect her. The court might consider the possibility of conditioning custody upon defendant returning to live in New Jersey, where the children will be more accessible to the father and directly subject to the continuing jurisdiction of our court. As an absolute minimum, she should be required to post bond to assure the father's visitation rights. Turney v. Nooney, 9 N.J. Super. 333 (Ch. Div. 1950). And if custody is granted the father, a bond should be required of the mother to guarantee the children's return to New Jersey after visiting with her.

IV.
Defendant contends that the trial court erred in fixing plaintiff's visitation rights, claiming that the order is unreasonable and impossible of enforcement. Of course, this claim would immediately be resolved were custody, if awarded to the mother, conditioned upon her returning to live in New Jersey.
However, we see no need to deal with the visitation question. It will be disposed of when the trial court, on remand, has reconsidered the custody question. Any visitation provision will, of course, be in furtherance of the duty of the parent given custody to aid and encourage the other parent's sincere effort to enhance the mutual love, affection and respect which should exist between that parent and the children.

*310 V.
The trial court, as we have seen, awarded defendant monthly alimony of $300, and $150 a month for each of the three children, a total of $750 a month, or $9,000 a year. N.J.S. 2A:34-23 reads, in pertinent part:
"* * * after judgment of divorce or maintenance, whether obtained in this state or elsewhere, the court may make such order as to the alimony or maintenance of the wife, and also as to the care, custody, education and maintenance of the children, or any of them, as the circumstances of the parties and the nature of the case shall render fit, reasonable and just, and require reasonable security for the due observance of such orders. * * *" (Emphasis supplied)
The statute is clearly permissive and calls for the exercise of the trial court's discretion in such a way as to reach a just and equitable result.
The word "alimony" in R.S. 2:50-37, predecessor of N.J.S. 2A:34-23, was construed in its "narrow and technical signification as an expression of the continuing duty of the husband to support the wife when he has been guilty of a matrimonial offense." (Italics ours) O'Loughlin v. O'Loughlin, 12 N.J. 222, 231 (1953), certiorari denied 346 U.S. 824, 74 S.Ct. 42, 98 L.Ed. 350 (1953). We cannot understand the basis for the trial judge's award of alimony in this case, for he expressly found that there was "no proof in the record that plaintiff was guilty of a matrimonial offense, except that he was so adjudicated in a Nevada decree."
True, plaintiff had been found guilty of "extreme cruelty" by the Nevada court. While this was a valid ground for dissolving the bonds of matrimony  at least under the relaxed standards of proof which we have encountered in Nevada divorce actions that have been implicated in New Jersey proceedings  it does not bind our courts when dealing with the questions of alimony and support. No constitutional provision or decision compels New Jersey to augment the Nevada decree by charging alimony against plaintiff. Shepherd v. Ward, 5 N.J. 92, 104 (1950). Cf. Lawrence v. Lawrence, *311 79 N.J. Super. 25, 33 (App. Div. 1963) (partition). The injustice of awarding alimony to the wife under the circumstances of this case were fully pointed out in Shepherd, at pages 109, 111-112. Our own law and our considered concepts of justice and equity require the denial of alimony to a wife who has left New Jersey without her husband's consent and without his having committed any matrimonial offense cognizable here.
There is absolutely no evidence in this case that plaintiff was guilty of a matrimonial offense. Rather, it affirmatively appears that it was defendant who deserted plaintiff and brought about the dissolution of the marriage. Accordingly, it was error for the trial court to award alimony. Since plaintiff only asks for reversal as to alimony, and not the support award, the alimony award should be reversed.

VI.
Defendant also attacks the trial court's denial of her application to order plaintiff to reimburse her for monies expended in maintaining herself and the infant children in her custody. Her answer and counterclaim contained no such claim. The matter first arose during the course of the trial, after the close of plaintiff's case, when defendant on her direct testimony attempted to introduce evidence as to $13,500 which she had allegedly borrowed, in part from her father and in part from a bank. When plaintiff objected to the testimony as improper, defendant moved to amend her counterclaim to add a count for reimbursement. The amendment was allowed over plaintiff's objection. However, no written pleading embodying the count was ever filed.
Aside from the fact that such part of the reimbursement claim as represents monies expended by defendant for her own support is foreclosed by what we have just said on the subject of alimony, we find no factual basis for the claim. The entire testimony touching the matter consists of defendant's bare assertion that she borrowed the $13,500 from her father and *312 the bank, and that it was for the support of herself and the children. Defendant gave no explanation or itemization of the expenditures allegedly incurred in a 15-month period.
Defendant acknowledges that there is no New Jersey case which authorizes such reimbursement as she here seeks. Garino v. Garino, 57 N.J. Super. 575 (App. Div. 1959), discussed the matter at length and noted the cases which allowed recovery where a husband deserts his wife, with the accompanying necessity on her part involuntarily to resort to her own earnings for self-support. Reimbursement is generally allowed on the analogy of an equitable suit by the wife to redress improper dealings by the husband with her separate estate. Ibid., at page 581. However, the court in Garino noted that even where the remedy is allowed, "it is generally recognized that it is to be administered in accordance with equitable principles." Reimbursement was there denied because of laches.
Defendant has failed to show any reason which would move the equitable conscience of our courts to recognize the remedy of reimbursement. She comes into court seeking this remedy after having removed herself from the jurisdiction without the consent of the husband or matrimonial fault on his part, and after having deliberately concealed her whereabouts for some months and, for over a year, having ignored orders of our court. Surely, during that time she could have moved in the pending New Jersey action, instituted before she began her Nevada divorce proceedings, for pendente lite relief.
Reimbursement might be allowed were the wife justified in living alone. However, such critical proof is absent in this case, so that an award could not equitably be made. Of course, there was no express promise or undertaking on the part of plaintiff to pay for defendant's support after she left the State of New Jersey.

VII.
Defendant claims error in the trial court's determination that she was not entitled to two Arabian horses *313 which defendant allegedly gave her. The basis for this claim is a note, dated April 14, 1961, whereby defendant purported to transfer all rights in the horses to defendant and assist in their care; and further, that she might at any time dispose of them as she saw fit, and he would sign the registry papers when they were presented to him.
We hold that defendant's claim was correctly denied. Our cases have repeatedly stated the requisites of a valid gift inter vivos: (1) a donative intent on the part of the donor; (2) actual delivery of the subject matter of the gift, unless it be a chose in action, in which case delivery must be of that variety of which it is most capable, and (3) the donor must strip himself of all ownership and dominion over the subject matter. See Rush v. Rush, 138 N.J. Eq. 611, 614-615 (E. & A. 1946). The record clearly shows that the last two elements were lacking. The horses were not delivered, and the registry papers (the only conceivable chose in action) never presented, signed or delivered. Plaintiff did not strip himself of ownership and dominion, but remained in complete control of the horses.

VIII.
We deal, now, with plaintiff's contention that the trial judge erred in denying his application to hold defendant in contempt for failure to comply with the order of May 17, 1962, awarding pendente lite custody of the three younger children to him. Defendant admitted that she had received a copy of the order through the mails shortly after it had been entered. She further admitted that she had personally been handed a copy here in New Jersey, prior to the beginning of the trial in February 1963.
The trial judge excused defendant's disregard of his order because she had relied on the Nevada decree. The problem, he said, had engaged the attention of the United States Supreme Court and he could not hold her in contempt "if she is puzzled by a problem that has puzzled many justices in our *314 highest court." There was no further clarification of the reference.
There are two answers to defendant's claim that she had a right to rely on her Nevada decree. In the first place, she chose to come into our court, answer the complaint, and by counterclaim seek alimony and support for herself and the three younger children, and also custody of the two older children who are with the father. Upon doing so, she became subject to the orders of the Chancery Division. But that aside, doubt as to the validity of an order is not an excuse for noncompliance, unless the court issuing it was in fact without jurisdiction. See In re Tiene, 17 N.J. 170 (1954), where the court said:
"* * * as a general rule a party cannot on an appeal from a judgment of conviction of contempt assert that the court order which he had contemned was based on error of law or fact, but rather the contemner's recourse is to take a direct appeal from the court order * * *. On the other hand, if the court was without jurisdiction over the subject matter or the parties, the person charged with the contempt may raise the question of lack of jurisdiction on appeal from the judgment of conviction of contempt * * *." (at page 177; citations omitted)
Accordingly, the trial judge should have held defendant in contempt. He may on remand, however, in assessing the penalty to be imposed, consider her alleged reliance on the custody provision of the Nevada decree and also her psychiatric condition as he may determine it to have been at the time.

IX.
Defendant's counsel, at the very close of his answering brief, for the first time asserts that the order of July 26, 1963, adjudging defendant in contempt for failure to comply with the visitation provisions of the final judgment entered some three months before, and suspending alimony and support payments until such time as she had purged herself of the contempt and granted plaintiff his visitation rights, should be *315 vacated. This contention is an afterthought. The existence of such an issue had never before been indicated, either in the points of the argument or in the counterstatement of questions involved. Defendant has never appealed from the July 26 order. Indeed, she presently advances no argument in support of the contention so belatedly made. There is, therefore, nothing before the court and we will disregard the argument.

X.
The judgment is reversed as to the award of custody of the three younger children to defendant, the award of alimony, and the trial court's denial of plaintiff's motion to hold defendant in contempt for failure to comply with the pendente lite custody order of May 17, 1962. The judgment is in other respects affirmed. The matter will be remanded to the Chancery Division for further proceedings in accordance with this opinion. Defendant's application for counsel fee and reimbursement of her printing costs is denied.