57 A.3d 1

FRANCIS NATHANIEL CLARK, PLAINTIFF–APPELLANT,
v. DENISE LOCKWOOD CLARK, DEFENDANT–
RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 19, 2012—Decided October 19, 2012.

Before Judges MESSANO, LIHOTZ, and KENNEDY.

*Matheu D. Nunn* argued the cause for appellant (*Einhorn, Harris, Ascher, Barbarito & Frost, P.C.*, attorneys; *Bonnie C. Frost* and *Mr. Nunn*, on the brief).

Respondent has not filed a brief.

The opinion of the court was delivered by

LIHOTZ, J.A.D.

In this matter, the parties' twenty-eight-year marriage ended in divorce on September 21, 2011. Plaintiff Francis Nathaniel Clark appeals from a provision contained in the final judgment of divorce requiring him to pay $600 per week as alimony to defendant Denise Lockwood Clark. At trial, plaintiff proved defendant secreted $345,690 from their closely held business during their marriage. Consequently, the trial judge ordered defendant to repay half the amount taken, in satisfaction of plaintiff's equitable distribution interest. The trial judge declined to offset these obligations, and an execution to secure payment of alimony was entered against plaintiff's wages. On appeal, plaintiff argues the

trial judge erred in applying the law. He maintains defendant's conduct led to divorce and demonstrates egregious fault obviating any alimony award. In the alternative, he asserts his monthly alimony obligation must be reduced because of the economic impact of defendant's marital fault, and he should be permitted to reduce his alimony payments by the debt defendant owes him. Finally, plaintiff challenges the amount representing his interest in the former business asset awarded as equitable distribution, and another limited aspect of the trial court's equitable distribution award regarding his repayment resulting from his alienation of a marital asset.

Following our review, we reverse the alimony provision of the final judgment of divorce, concluding the facts support a finding defendant engaged in conduct rising to the level of egregious fault. We remand to the trial court for consideration of whether, in light of the showing of egregious marital fault, alimony should be denied.

I.

In the divorce proceeding, the parties resolved certain matters. The areas of disagreement focused on alimony and equitable distribution. Because these issues remain the concerns on appeal, we limit our factual recitation to those matters.

Plaintiff and defendant were married on February 19, 1983, and have four children. Plaintiff, the residential custodial parent, lives in the former marital home with the three youngest unemancipated children,[1] and defendant lives in Florida.

During the marriage, the parties were equal shareholders in DeFranc, Inc., which owned and operated Grayrock Pharmacy (Grayrock). Plaintiff was Grayrock's founder and pharmacist. Since 1995, defendant was Grayrock's bookkeeper, a job requiring

---

[1] At the time of divorce, the oldest child was emancipated and lived on her own. The other three children included a college student, a special needs adult, and the youngest, a minor.

her to "overs[ee] the administration of all the bookkeeping, the staff maintenance, payroll, making deposits, all the reconciliations, interfacing with the vendors and the lenders . . ., [and also] taking care of financials [and] preparing everything for the accountant."

The parties frequently squabbled over money. Plaintiff believed defendant spent too much and defendant suggested plaintiff was too cautious. In 2006, defendant initiated divorce discussions and hired counsel, paying a $2500 cash retainer. She filed a complaint on April 3, 2007, which she later withdrew to avoid the possibility of the parties' personal problems suggesting Grayrock could be purchased cheaply. Plaintiff filed his complaint for divorce on April 9, 2008.

In June 2008, Grayrock's accountant, Ron Zuckerman, warned that Grayrock was facing failure due to a cash flow shortage. Plaintiff commenced discussions to sell the business. He secured an $800,000 purchase offer from Drug Fair and also entertained discussions with Hank Incognito to sell the business for $1,000,000. Defendant's objections to these proposals generated plaintiff's motion to compel her cooperation with a sale of Grayrock. A Family Part judge denied plaintiff's motion, finding he failed to prove the financial necessity of a sale and because the asset provided a substantial source of income for the family. However, the motion judge determined the parties were draining cash from the business for their personal use, which created distrust between them and adversely affected operations. Consequently, she appointed a custodial receiver and approved the use of joint funds to "obtain experts to review [Grayrock's] financials . . . to determine its value and the advisability of a sale[.]" Notwithstanding this intervention, Grayrock ultimately filed for bankruptcy and its assets were sold to Roseville Pharmacy, L.L.C., for $114,000.

During discovery in the matrimonial proceeding, plaintiff learned defendant held a savings account and safe deposit boxes titled solely in her name. The savings account records reflected large deposits, prompting further inspection. He also determined plaintiff had made withdrawals from the children's accounts.

In accordance with the court order, plaintiff employed Albert P. Russo, C.P.A., to examine Grayrock's cash flow. Russo's report supported a pattern of consistent removal of significant cash receipts from the pharmacy.

After reviewing Russo's report, plaintiff maintained defendant "utilize[d] her position as bookkeeper to divert cash from the business, moving it between bank accounts, her basement, and safe deposit boxes." Plaintiff believed defendant had secreted more than $400,000 from the business's cash receipts between January 1, 2004 and July 31, 2008, by siphoning thirty-four to forty percent of the daily cash receipts. In addition to the disparity between sales and deposits, plaintiff noted, and Russo's report confirmed, when "an alternate bookkeeper did the books" during periods of defendant's absence, "the amount of cash ... to be deposited and actually ... deposited on the deposits slips matched perfectly."

A different Family Part judge conducted trial over six days. In addition to his own testimony, plaintiff presented two fact witnesses. Kerry Milford, a former pharmacy employee and friend of the parties, related a telephone message defendant had left on her answering machine, asking Milford to do her a "huge favor." Defendant asked Milford to lie to plaintiff by telling him she forgot she had borrowed $10,000 from defendant and discarded the receipt. Defendant also urged Milford not to disclose this plan to plaintiff. Milford confirmed the parties routinely fought about pharmacy finances, with plaintiff complaining about the poor cash flow and defendant telling him not to worry about it. Another friend of the parties, Elaine Sasso, testified to two instances when she saw defendant come from the basement of the parties' home with a one-inch stack of cash in her hand, including $100 bills. She also recounted a conversation with defendant in 2006, during which defendant revealed she and plaintiff "were no longer getting along and that [they] hadn't been intimate since the October before[,]" but that there was no need to "worry" because she was "taking care of [her]self financially."

Plaintiff also presented Russo's expert testimony regarding his forensic analysis of Grayrock's cash activity from January 2004 to August 2008. Russo found significant discrepancies between the recorded cash sales and bank deposits. He examined the "operating bank account statements, deposit slips, and daily cash reports" from January 1, 2004 to July 31, 2008, computing a total discrepancy of $365,423. Further, gaps in the records caused by "missing" records for the period of August through December 2005, and August 2006 to October 2006, were considered by "us[ing] an average of the other . . . months . . . to come up with an extrapolated discrepancy," which increased the likely loss to as much as $407,656.

Defendant testified on her own behalf. She denied taking the claimed missing cash and insisted the discrepancies identified in Russo's report resulted from several sources. First, she asserted the computer system which recorded Grayrock's sales transactions consistently malfunctioned by overstating sales. Second, plaintiff and other employees had access to and removed cash. Third, the pharmacy paid several items from a petty cash fund, which was regularly replenished with money from the cash drawer. Fourth, defendant insisted she obliged plaintiff's orders regarding the pharmacy income and did the best she could to reconcile the finances in light of plaintiff's refusal to follow her accounting system.

Defendant also discussed the basis of her rejection of the Drug Fair offer, which she felt was too low, and detailed her efforts to continue Grayrock's viability so the parties could sell it for a larger profit. As to the Incognito deal, defendant theorized Incognito and plaintiff were friends and his offer was never firm.

In response to plaintiff's claim that defendant withdrew money from their children's accounts, defendant stated plaintiff told her to do so to pay marital and business expenses. Further, she disputed plaintiff's theory regarding other large deposits to her individual bank account, explaining they resulted from credit card cash advances or gifts from friends.

In support of her request for alimony, defendant noted plaintiff remained at the pharmacy, after being hired as an employee by the new owner, and earned $107,000 a year. Defendant remained unemployed after plaintiff forced her to leave Grayrock. She contended she was unable to find a job and had no income or resources. She also discussed the parties' individual bankruptcy filings subsequent to Grayrock's Chapter 7 liquidation.

The trial judge rendered a comprehensive oral opinion, granting plaintiff's request for divorce and addressing the parties' requests for collateral relief. With respect to the issues presented on appeal, the judge found plaintiff's income was $110,000 per year and defendant was "unemployed without just cause," thus requiring the imputation of income to her in the amount of $38,584 per year, based upon the Florida Department of Economic Opportunity Occupational Employment and Wages report. Reviewing the applicable factors in *N.J.S.A.* 2A:34–23(b), the trial judge found, among other things, the parties had a long-term marriage, defendant remained financially dependent, and plaintiff had available resources to support himself and contribute to defendant's support. The judge ordered plaintiff to pay defendant permanent alimony of $600 per week.

The judge ordered the division of the remaining marital assets. He ordered defendant to repay funds she dissipated from the children's accounts. He also found plaintiff sold a family car in violation of a pendente lite restraint on alienation of marital assets, for which he was ordered to reimburse defendant fifty percent of the vehicle's value. With respect to Grayrock, the judge rejected plaintiff's claim that defendant had dissipated the asset by thwarting its sale. He denied plaintiff's request for payment of half of the potential profit the parties would have realized had Grayrock been sold to Incognito. The judge found the dispute was "foolish in hindsight," but nevertheless was "bona fide" reflecting a "legitimate contest between the parties." However, the trial judge determined Russo's credible testimony supported a finding that defendant "took and hid sums of money as

the bookkeeper from the business and from the marriage." She was ordered to pay plaintiff $172,845, representing one-half of the amount wrongfully withdrawn. A final judgment of divorce memorializing these and other ordered provisions was entered on September 21, 2011.

Plaintiff appeals from the alimony award, arguing defendant's egregious conduct extinguishes any obligation to pay alimony. In the alternative, he asserts the court erred in denying his request to offset his monthly alimony payments by the amount of defendant's debt to him resulting from her theft. Further, plaintiff contends the trial court erred in finding defendant had not willfully obstructed the sale of the pharmacy to his detriment, and in limiting his share of the secreted funds to fifty percent. Finally, he disputes the trial judge's finding that he dissipated marital assets.

## II.

The scope of our review of a trial court's findings is limited. *Platt v. Platt,* 384 *N.J.Super.* 418, 425, 894 *A.*2d 1221 (App.Div. 2006). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." *Cesare v. Cesare,* 154 *N.J.* 394, 411–12, 713 *A.*2d 390 (1998). We accord particular deference to the judge's factfinding because of "the family courts' special jurisdiction and expertise in family matters." *Id.* at 413, 713 *A.*2d 390. Reversal is warranted only when a trial court's findings reflect a mistake must have been made because the factual findings are " 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.' " *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974) (quoting *Fagliarone v. Twp. of N. Bergen,* 78 *N.J.Super.* 154, 155, 188 *A.*2d 43 (App.Div.), *certif. denied,* 40 *N.J.* 221, 191 *A.*2d 61 (1963)).

In our review, we are also obliged to accord deference to the trial judge's credibility determinations. *Cesare, supra,* 154

*N.J.* at 412, 713 *A.*2d 390. Such deference is appropriate because the trial judge has "a feel of the case" and is in the best position to "make first-hand credibility judgments about the witnesses who appear on the stand." *Div. of Youth & Family Servs. v. E.P.*, 196 *N.J.* 88, 104, 952 *A.*2d 436 (2008) (internal quotation marks and citations omitted). "When the credibility of witnesses is an important factor, the trial court's conclusions must be given great weight and must be accepted by the appellate court unless clearly lacking in reasonable support." *Div. of Youth & Family Servs. v. F.M.*, 375 *N.J.Super.* 235, 259, 867 *A.*2d 499 (App.Div.2005) (citing *In re Guardianship of D.M.H.*, 161 *N.J.* 365, 382, 736 *A.*2d 1261 (1999)). Consequently, when a reviewing court concludes there is satisfactory evidentiary support for the trial court's findings, " 'its task is complete and it should not disturb the result, even though it has the feeling it might have reached a different conclusion were it the trial tribunal.' " *Beck v. Beck*, 86 *N.J.* 480, 496, 432 *A.*2d 63 (1981) (quoting *State v. Johnson*, 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964)).

When "the focus of the dispute is . . . alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom, the traditional scope of review is expanded." *In re J.T.*, 269 *N.J.Super.* 172, 188–89, 634 *A.*2d 1361 (App.Div.1993) (internal quotation marks and citations omitted). Deference is appropriately accorded to factfinding; however, the trial judge's legal conclusions, and the application of those conclusions to the facts, are subject to our plenary review. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995). Our review of a trial court's legal conclusions is always de novo. *D.W. v. R.W.*, 212 *N.J.* 232, 245-46, 52 *A.*3d 1043 (2012) (citing *Balsamides v. Protameen Chems.*, 160 *N.J.* 352, 372, 734 *A.*2d 721 (1999)).

A Family Part judge has broad discretion in setting an alimony award and in allocating assets subject to equitable distribution. *Steneken v. Steneken*, 367 *N.J.Super.* 427, 435, 843 *A.*2d 344 (App.Div.2004), *aff'd as modified*, 183 *N.J.* 290, 873 *A.*2d 501

(2005). The exercise of judicial discretion "is not unbounded and it is not the personal predilection of the particular judge." *State v. Madan*, 366 *N.J.Super.* 98, 109, 840 *A.*2d 874 (App.Div.2004). Rather, the nature of judicial discretion requires a trial judge to determine whether to act, and if so, to render a decision "guided by the spirit, principles and analogies of the law, and founded upon the reason and conscience of the judge, to a just result in the light of the particular circumstances of the case." *Smith v. Smith*, 17 *N.J.Super.* 128, 132, 85 *A.*2d 523 (App.Div.1951) (citations omitted), *certif. denied*, 9 *N.J.* 178, 87 *A.*2d 387 (1952). Moreover, the court must provide factual underpinnings and legal bases supporting the exercise of judicial discretion. *See Madan, supra*, 366 *N.J.Super.* at 110, 840 *A.*2d 874. We will reverse only if we find the trial judge clearly abused his or her discretion, such as when the stated "findings were mistaken[,] . . . the determination could not reasonably have been reached on sufficient credible evidence present in the record[,]" or the judge "failed to consider all of the controlling legal principles[.]" *Gonzalez–Posse v. Ricciardulli*, 410 *N.J.Super.* 340, 354, 982 *A.*2d 42 (App.Div.2009) (citations omitted).

### III.

Plaintiff urges us to vacate the alimony provision in the final judgment of divorce because the trial judge failed to apply applicable legal principles which plaintiff believes require a denial of defendant's request for alimony. Plaintiff argues an otherwise valid alimony claim is extinguished, and the economic ties between the parties are severed, upon a finding of egregious conduct resulting in divorce. Plaintiff states this standard is satisfied by the trial court's finding that defendant stole and dissipated marital assets during and in contemplation of divorce. In the alternative, plaintiff suggests no alimony be paid until the net judgment due him is satisfied.

We emphasize that the purpose of awarding alimony to a spouse is based on "an economic right that arises out of the

marital relationship and provides the dependent spouse with a level of support and standard of living generally commensurate with the quality of economic life that existed during the marriage." *Mani v. Mani,* 183 *N.J.* 70, 80, 869 *A.*2d 904 (2005) (internal quotation marks and citations omitted). When determining whether an award of alimony is warranted, a trial judge must issue "specific findings on the evidence" presented, *N.J.S.A.* 2A:34–23(c), weighing the objective standards delineated in *N.J.S.A.* 2A:34–23(b).[2] Additionally, *N.J.S.A.* 2A:34–23(g) suggests a trial court may also consider facts supporting marital fault when determining the amount of alimony. *See N.J.S.A.* 2A:34–23(g) (providing in an action for divorce, "the court may consider ... the proofs made in establishing [the] ground [for divorce] in determining an amount of alimony").

The role of marital fault in formulating whether an alimony award should be issued was squarely addressed by the Supreme Court in *Mani, supra,* 183 *N.J.* at 78–93, 869 *A.*2d 904. The majority concluded generally "marital fault is irrelevant" to considerations and determinations of alimony. *Id.* at 72, 869 *A.*2d 904. Justice Long, writing for the majority, stated: "The thirteen alimony factors listed in *N.J.S.A.* 2A:34–23(b) clearly center on the economic status of the parties. That is the primary alimony focus." *Id.* at 88, 869 *A.*2d 904. The Court also affirmed the long-

---

[2] When setting an alimony award, a trial judge must consider (1) the parties' "actual need and ability ... to pay"; (2) "[t]he duration of the marriage"; (3) the respective "age, physical and emotional health" of the parties; (4) "[t]he standard of living established in the marriage ... and the likelihood that each party can maintain a reasonably comparable standard of living"; (5) "earning capacities, educational levels, vocational skills, and employability" of each party; (6) "[t]he length of absence from the job market of the party seeking maintenance"; (7) parental childcare responsibilities; (8) "[t]he time and expense necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment"; (9) any "history of the financial or non-financial contributions to the marriage"; (10) "[t]he equitable distribution of property ordered"; (11) the investment income of either party; (12) the resultant tax consequences of an award; and (13) "[a]ny other factors which the court may deem relevant." *N.J.S.A.* 2A:34–23(b).

standing principle that "alimony is neither a punishment for the payor nor a reward for the payee[,]" but rather is designed for the purpose of assisting an economically dependent spouse. *Id.* at 80, 869 *A.*2d 904 (citations omitted). Further, although *N.J.S.A.* 2A:34–23(g) references the basis for a cause of action for divorce, which remains a "consideration" when addressing an alimony claim, marital fault typically does not garner much, if any, weight. *Id.* at 88, 869 *A.*2d 904 (*citing Kinsella v. Kinsella,* 150 *N.J.* 276, 313–14, 696 *A.*2d 556 (1997) (noting "the practical consequences of succeeding in a divorce action on fault-based grounds, as opposed to separation, are minimal")). Consequently, the Court concluded in most cases "marital fault is irrelevant" to a trial court's alimony calculation. *Id.* at 72, 869 *A.*2d 904.

However, the Court acknowledged two "narrow" exceptions to this general principle: "cases in which the fault has affected the parties' economic life and cases in which the fault so violates societal norms that continuing the economic bonds between the parties would confound notions of simple justice." *Ibid.* With respect to the first exception, the Court held "to the extent that marital misconduct affects the economic status quo of the parties, *it may be taken into consideration* in the calculation of alimony." *Id.* at 91, 869 *A.*2d 904 (emphasis added). However, when egregious "conduct occurs, *it may be considered* by the court, not in calculating an alimony award, but *in the initial determination of whether alimony should be allowed at all.*" *Id.* at 92, 869 *A.*2d 904 (emphasis added).

In this case, we note defendant's illicit conduct invoked two statutory considerations to be weighed when fixing alimony: the "history of the financial or non-financial contributions to the marriage," *N.J.S.A.* 2A:34–23(b)(9), and the "so-called 'catch all category,'" which "permits a court to consider 'any other factor' it may 'deem relevant,'" *Mani, supra,* 183 *N.J.* at 81, 869 *A.*2d 904 (quoting *N.J.S.A.* 2A:34–23(b)(13)). Moreover, defendant's conduct fell within *Mani*'s delineated "narrow band of cases" that "affected the parties' economic life," impacting the amount of any

alimony awarded, *id.* at 72, 91, 869 *A.*2d 904, a consideration omitted by the trial judge. The question is whether defendant's marital misconduct rises to the level of "egregious fault," which could preclude any award of alimony.

"Egregious fault," a "term of art," requires proof transcending extended or "public acts of marital indiscretion." *Id.* at 92, 869 *A.*2d 904. In *Mani,* the cause of action was based on the plaintiff's claims the defendant was repeatedly indolent and adulterous. *Id.* at 75–76, 869 *A.*2d 904. The Court rejected such an expression of marital indiscretion as fulfilling the requirements of "egregious fault." *Id.* at 92, 869 *A.*2d 904. To illustrate egregious conduct, Justice Long identified examples such as "a dependent spouse who has attempted to murder the supporting spouse" and "[d]eliberately infecting a spouse with a loathsome disease[.]" *Ibid.*

Admittedly, the fault-based claim in this matter is unlike the discreet examples stated in *Mani,* as defendant's thievery caused no physical harm to defendant. Nevertheless, defendant's conduct transcends mere "economic impact," as she not only betrayed the sanctity of the marital vows of trust, but also kicked their economic security in the teeth by secretly draining cash from the pharmacy. Defendant conceived and carried out a long-term scheme to embezzle the cash receipts from Grayrock, which deprived plaintiff of the immediate fruits of his daily labors and impinged on the viability of the joint business asset and the family's future security. We determine her actions smack of criminality and demonstrate a willful and serious violation of societal norms.

In support of his position, plaintiff relies on our decision in *Reid v. Reid,* 310 *N.J.Super.* 12, 708 *A.*2d 74 (App.Div.), *certif. denied,* 154 *N.J.* 608, 713 *A.*2d 499 (1998), wherein we affirmed the trial judge's denial of the defendant's alimony claim because she had "divert[ed] daily [marital business] receipts through her personal accounts and [had] not record[ed] substantial cash transactions in the corporate books." *Id.* at 21, 708 *A.*2d 74 (internal quotation marks omitted). We examined "whether this improper economic

conduct, deemed 'marital fault' by [the trial judge], was appropriately considered as a factor in determining defendant's entitlement to alimony." *Ibid.* In reaching our conclusions, we considered the Court's then-recent observations regarding the impact of marital fault, i.e., " 'in today's practice, marital fault rarely enters into the calculus of an alimony award.' " *Id.* at 22, 708 *A.*2d 74 (quoting *Kinsella, supra,* 150 *N.J.* at 314–15, 696 *A.*2d 556). We determined the facts demonstrated "the 'rare' case justifying consideration of defendant's conduct during the marriage as a basis for rejecting her alimony demand," and concluded "th[e] conduct should not be rewarded in a court of equity by an order entitling her to alimony." *Ibid.*

Although the Supreme Court in *Mani* canvassed prior case law addressing the effect of marital fault and reinforced *Kinsella*'s observations articulated above, the Court omitted mention of our holding in *Reid.* Accordingly, we are free to consider whether extraordinary, flagrant, economic misconduct during the marriage may rise to the level of egregious fault resulting in divorce and warranting denial of an otherwise valid claim for alimony.

Marital fault which merely "affects the economic status quo of the parties," as identified in *Mani, supra,* 183 *N.J.* at 91, 869 *A.*2d 904, might include things such as gambling, excessive spending, waste of marital assets, or other acts of bad judgment. This is not "egregious fault." However, when marital misconduct, even though economically based, evinces significant, willful wrongdoing, designed to fraudulently and purposefully deprive one's spouse of the economic benefits of the marital partnership, the acts transcend fault affecting the economic status quo, and in fact "violate[ ] societal norms," *id.* at 73, 869 *A.*2d 904, and equate to "egregious fault." In analyzing such instances, trial courts must consider the totality of the facts and circumstances presented and determine whether the conduct warrants severing all economic bonds between the parties by precluding an alimony award.

Here, when considering defendant's claim for alimony, the trial judge made a thorough and detailed analysis of each of the

statutory economic considerations required by *N.J.S.A.* 2A:34–23(b), without regard to whether defendant's economic improprieties were so outrageous as to warrant additional relief as directed by *Mani.* We conclude this omission is fatal. Consequently, we vacate the alimony award set forth in the final judgment of divorce and remand to the trial court for further consideration in light of our opinion.

On remand, the court must assess defendant's conduct in light of the standard we have articulated to discern whether egregious fault has been demonstrated. If so, the court must then consider whether the conduct obviates the propriety of an award of alimony. Finally, if the court concludes alimony remains warranted, the trial judge must nevertheless assess the impact of defendant's conduct prior to fixing an amount of alimony.

The trial court's determination could include an offset against the alimony award by the amount stolen by defendant and now due to plaintiff. We recognize, as did the trial judge, that alimony and equitable distribution are distinct but related types of relief. However, the discretionary application of the equitable maxim of unclean hands applies to matrimonial cases. *Heuer v. Heuer,* 152 *N.J.* 226, 238, 704 *A.*2d 913 (1998). It is well settled that a party " 'in equity must come into court with clean hands and ... must keep them clean ... throughout the proceedings.' " *Chrisomalis v. Chrisomalis,* 260 *N.J.Super.* 50, 53–54, 615 *A.*2d 266 (App.Div.1992) (quoting *A. Hollander & Son, Inc. v. Imperial Fur Blending Corp.,* 2 *N.J.* 235, 246, 66 *A.*2d 319 (1949)). *See also Thompson v. City of Atlantic City,* 190 *N.J.* 359, 384, 921 *A.*2d 427 (2007) (holding " 'he who seeks equity must do equity' ") (quoting *Ryan v. Motor Credit Co.,* 132 *N.J. Eq.* 398, 401, 28 *A.*2d 181 (E. & A.1942)). Simply stated, "a court should not grant relief to one who is a wrongdoer with respect to the subject matter in suit." *Faustin v. Lewis,* 85 *N.J.* 507, 511, 427 *A.*2d 1105 (1981). Consequently, equity demands the trial court consider defendant's dishonest, illegitimate conduct, and its impact on the past and future economic security of plaintiff and the children.

Following our review of the remaining arguments challenging the determination of plaintiff's interest and obligations regarding equitable distribution, we conclude they lack sufficient merit to warrant extensive discussion in our opinion. *R.* 2:11–3(e)(1)(E). We offer only these brief comments.

The trial judge's effectuation of an equitable distribution of property, *N.J.S.A.* 2A:34–23(h), was guided by the considerations set forth in *N.J.S.A.* 2A:34–23.1. We conclude the judge's determination of the nature and value of marital assets and debts, as well as the percentage distribution of those assets and debts as between the parties, properly considered the particular circumstances of the parties as required by the statute. We are not persuaded and find no basis to conclude the result ordered failed to achieve "a just and equitable result." *See Salmon v. Salmon,* 88 *N.J.Super.* 291, 310, 212 *A.*2d 171 (App.Div.1965).

We also conclude there was substantial, credible evidence in the record to support the trial judge's finding that defendant was not responsible "for the loss of the business" as a result of her rejection of the purchase offers from Drug Fair and Incognito. Plaintiff failed to satisfy his burden of proving otherwise. The trial judge stated the evidence was "in equipoise." *See Liberty Mut. Ins. Co. v. Land,* 186 *N.J.* 163, 169, 892 *A.*2d 1240 (2006) (citations omitted). Therefore, plaintiff's claim was not proven and was properly denied. *Ibid.*

In conclusion, we reverse the alimony award set forth in the September 21, 2011 final judgment of divorce, and remand to the trial court for further consideration consistent with this opinion. We affirm the remaining provisions of the final judgment of divorce.

Affirmed in part and reversed in part.