RYAN, G. P., J.S.C.
*449 In this domestic violence case, the court addresses two legal issues of first impression capable of repetition based upon the ever-changing dynamics of interpersonal relationships. First, the court analyzes whether a plaintiff can qualify as a "victim of domestic violence" based upon a "dating relationship" which involves *450 consensual, but sporadic, private sexual relations between adults with few, if any, of the traditional elements of a dating relationship set forth in Andrews v. Rutherford, 363 N.J. Super. 252, 260, 832 A.2d 379 (Ch. Div. 2003). Second, the court addresses whether a defendant may assert the defense of consent, N.J.S.A. 2C:2-10, to allegations of simple assault, N.J.S.A. 2C:12-1(a)(1), and harassment by offensive touching, N.J.S.A. 2C:33-4(b), when the plaintiff admittedly agreed to "consensual rough sex" with defendant. Based upon the facts and circumstances of this case, the court answers both questions in the affirmative.
I.
Plaintiff is a twenty-two year-old female who has known defendant, a twenty-five year-old male, since high school. On September 20, 2017, plaintiff filed a domestic violence civil complaint under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, alleging predicate acts of assault and harassment. A temporary restraining order (TRO) was issued by a Superior Court Judge after plaintiff appeared before a domestic violence hearing officer. As part of her jurisdictional grounds, plaintiff alleged she and defendant "have had a dating relationship" although she later testified she selected that choice because it was the only option potentially applicable. In her complaint, plaintiff alleged she has "had a sexual relationship with defendant that has lasted [for] 8 years." The complaint alleges that on September 18, 2017, defendant came to plaintiff's home "after she invited him over" and "during the act" of "consensual rough sex" defendant told plaintiff that he hated her and "punched her in the face with a closed fist." After plaintiff questioned him about the punch, plaintiff alleges defendant "laughed and punched her again." The allegations of the complaint include a specific admission by plaintiff that she agreed to "have consensual rough sex" with defendant but "him punching her was not part of it."
Both parties appeared for a final hearing on September 28, 2017. After being advised of their right to counsel and the *451 consequences of a final restraining order, the parties elected to represent themselves and proceed to trial. Both parties testified and cross-examined each other, but called no other witnesses.
The testimony was in agreement that the parties' sexual relationship began when plaintiff was fifteen years of age and defendant was seventeen. According to plaintiff, they had sex "more frequently" during the first three years of their relationship, roughly between the time plaintiff was fifteen to eighteen years old, followed by a three-year absence of sexual relations. For approximately the last year or so, the parties' relationship has been limited to private encounters involving "consensual rough sex."
The court questioned plaintiff on the six factors of Andrews,[1] 363 N.J. Super.
*155 at 260, 832 A.2d 379, to determine whether a dating relationship existed. Plaintiff's testimony established the following: there was little interpersonal bonding; the relationship was mostly based upon sporadic and casual sexual encounters; the relationship, while not seen by either as "dating," lasted eight years; the frequency of the encounters varied from "more frequently" while in high school, to a three-year period of no sexual relations, to approximately once every three months for the last year or more; neither party had any ongoing expectations with respect to the future or permanency of the relationship; the parties did not demonstrate an affirmation of their relationship to others, nor did they hold themselves out to friends and family as "boyfriend and girlfriend." Thus, except for the eight-year duration, most of the Andrews factors weigh against a finding of a *452 "dating relationship." However, the sixth Andrews factor ("any other reasons unique to the case that support or detract from a finding of a 'dating relationship' ") requires further analysis based upon the ever-changing limits of interpersonal relationships.
Plaintiff testified, and defendant agreed, that she texted defendant during the late night hours of September 17 into September 18, 2017, to come to her house for sexual relations.[2] Defendant arrived at plaintiff's home sometime after 1 a.m. Shortly thereafter, in plaintiff's words, the parties engaged in "consensual rough sex." When asked to describe her understanding of the parameters of rough sex, plaintiff testified she consented to "slapping," "hair pulling" and "choking" but she did not consent to being punched "with a closed fist." After several minutes of consensual sexual relations, plaintiff testified defendant punched her in the left side of her jaw with a closed fist. She testified she "was in shock" and "can't remember what it felt like." Nevertheless, she did not stop the encounter. She testified, "we continued to having sex. I was in shock ... I kept going." She estimated the sexual relations continued for another twenty minutes.[3] After the sexual relations ended, plaintiff testified she "repeatedly brought up that he had punched [her] in the face." Plaintiff claimed defendant "brushed it off" and attempted to sleep over but she objected and he left her home between 2:30 and 3 a.m.
When asked to further amplify on the extent of her agreement to have "rough sex," plaintiff testified she "consented to [an] open palm, but [she] did not consent to [a] closed fist." However, she admitted the parties never verbalized or delineated the limits of use of force during relations.
The complaint included allegations of a past history of domestic violence involving vulgar name calling and verbal abuse. When *453 asked about the history, plaintiff did not detail those allegations in her testimony. *156 Instead, she indicated she and defendant had previously seen each other in June 2017 but it involved only "kissing," not sexual relations. She further testified defendant, during the summer of 2017, had come to her place of employment, a local retail establishment that sells adult products and novelties. She is concerned he will return to her place of employment.
As to the need for a final restraining order (FRO), plaintiff testified she is "afraid of defendant's impulsivity" and she wants "other women protected" from him.
Defendant agreed with most of plaintiff's recitation of the history of their relationship, although he described it simply as they "would meet up and have sex" and not see each other for up to six months in between encounters. Contrary to plaintiff, defendant testified the parties did have sexual relations in June 2017 and, about a month later, plaintiff "messaged" the girlfriend of defendant to say he had "cheated on her." On re-direct, plaintiff conceded she did contact defendant's girlfriend and said words to that effect. Sometime that August, defendant went to plaintiff's place of work to question her about contacting his girlfriend. Defendant said plaintiff told him to leave or she would call the police. Both parties agree defendant left voluntarily and has not returned to plaintiff's work.
As to the events of the early morning hours of September 20, defendant testified plaintiff texted him while he was at work at a local bar. Thereafter, he went to plaintiff's house "to have sex." In his words, they "had a conversation for a few minutes ... we were having sex for about 20 minutes ... I did hit her... it was playful ... we have had rough sex ..." for years. The defendant felt the parties had an agreement to be rough and suggested that it is not as if they have written contracts to define their limits. Defendant admitted that after his punch, "she objected to being hit" but then they "had more sex." He testified "[i]t was a closed fist and a tap on the jaw ... [he] was not intending to harm her ... there is a fine line to how rough [they] get." When asked to describe that *454 "fine line," defendant testified "[t]here is definitely hitting and slapping and choking." After concluding their sexual relations, defendant testified they had a conversation about "it," referring to the punch. He told plaintiff "it was playful." Defendant promised "not to do it again." However, when he left her home that night, he felt they "had an agreement not to do that again" but would continue to otherwise have rough sex.
Defendant disputed the need for the entry of a FRO, claiming he never goes to plaintiff's home unless invited and, other than the one time in August to question plaintiff about contacting his girlfriend, defendant has only gone to plaintiff's place of employment to make "a purchase." Plaintiff admitted defendant has not come to her home uninvited.
Plaintiff was initially credible, principally because of her candor with regard to the scope of her consent with defendant. However, her credibility waned. She was inconsistent as to whether defendant actually punched her a second time. Further, plaintiff's testimony regarding a prior history of domestic violence was completely inconsistent with the allegations in her complaint. In fact, plaintiff's testimony established there was no prior history of violence.
Defendant was a credible witness. He did not minimize his actions. The court found defendant's admission of a single punch to be believable. The balance of his testimony was candid and straightforward. The defendant maintained eye contact. Defendant's description of the parties' encounter in June, as well as his visit to her *157 place of employment in August, was far more credible than plaintiff's testimony.
II.
"Victim of domestic violence" is defined in the PDVA. N.J.S.A. 2C:25-19(e). Among other protected persons, a victim "includes any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship." Ibid. Courts have long observed the legislature left the term "dating *455 relationship" undefined in the PDVA. Andrews, 363 N.J. Super. at 257, 832 A.2d 379. Judge Hogan's opinion in Andrews notes the inclusion of the word "relationship" rather than simply "dating" is in concert with the other persons protected under the PDVA, as all classes of persons who have "a continuing, frequent and observable relationship with one another." Ibid.
A mere quantitative analysis of the Andrews factors to the facts of this case could lead a court to conclude the parties did not have a dating relationship. To do so, however, would be to ignore the remedial purpose of the PDVA to protect victims to the greatest extent possible. Tribuzio v. Roder, 356 N.J. Super. 590, 596, 813 A.2d 1210 (App. Div. 2003). The PDVA itself announces that its purpose is "to assure the victims of domestic violence the maximum protection from abuse the law can provide." N.J.S.A. 2C:25-18. In Andrews, 363 N.J. Super. at 259-60, 832 A.2d 379, Judge Hogan noted a trial court should consider, "at a minimum" the six enumerated factors and "one or more of the factors may be more or less relevant in any given case depending on the evidence presented." The list is, therefore, non-exclusive. The sixth factor ("any other reasons unique to the case that support or detract" from finding a dating relationship) is, itself, expansive and invites a court to consider the realities of a relationship between parties. Therefore, a qualitative analysis of the Andrews factors is more appropriate than a numerical analysis.
In J.S. v. J.F., 410 N.J. Super. 611, 983 A.2d 1151 (App. Div. 2009), the defendant claimed the plaintiff was a "paid escort" rather than a date. He asserted his interactions with the plaintiff occurred when he frequented local clubs where the plaintiff worked as a dancer. In affirming the trial court's finding of a dating relationship, the Appellate Division noted, "although Andrews suggests some useful factors, courts should vigilantly guard against a slavish adherence to any formula that does not consider the parties' own understanding of their relationship as colored by socio-economic and generational influences." J.S., 410 N.J. Super. at 616, 983 A.2d 1151. The J.S. court rejected "the contention that *456 a relationship which includes a payment of consideration for the other's time precludes the finding of a dating relationship." Id. at 615, 983 A.2d 1151. There, however, despite meeting at a local dance club and evidently exchanging payment, the defendant later invited the plaintiff to his parents' home for Thanksgiving dinner. The trial court also found credible the plaintiff's testimony that the defendant took her to his home, introduced her to his family, went out in public with her as well as spent weekends with her. Id. at 617, 983 A.2d 1151. Regardless of any initial "payment," the relationship of the parties in J.S. progressed to one where several of the Andrews factors were, in fact, present.
While the J.S. court declined to endorse the Andrews test, a subsequent appellate decision has done so. In S.K. v. J.H., 426 N.J. Super. 230, 236, 43 A.3d 1248 (App. Div. 2012), the Appellate Division concluded "that Andrews poses the appropriate questions to be considered when the existence of a dating relationship is disputed while recognizing that, if applicable, other *158 factors unique to the parties should also be weighed." There, the plaintiff and the defendant were on a trip abroad with dozens of others. Id. at 233, 43 A.3d 1248. After sitting and talking in a bar for a few hours, and dancing briefly, the defendant walked with the plaintiff and one of the plaintiff's friends back to her room. Ibid. When she rebuffed the defendant's attempt to kiss her, the defendant brutally assaulted plaintiff. He was later convicted of assault. Ibid. The Appellate Division noted the parties in S.K. may very well have viewed the encounter "as a date" but, in reversing the entry of a final restraining order, the court found applying the PDVA to a single date would "give too little weight to the word 'relationship.' " Id. at 239, 43 A.3d 1248.
In this matter, the parties never progressed to a relationship that was recognized in public or by others. It was neither open nor "observable." Arguably, the parties had a sexual relationship which they attempted to keep secret. Certainly, defendant sought to conceal his relationship with plaintiff from his actual girlfriend. Therefore, the question is whether a private relationship *457 of consensual, but sporadic, sexual encounters can be construed as a "dating relationship" under the PDVA. This court concludes it can and should be. Here, it is undisputed the parties engaged in intimate, physical and sexual relations over the course of approximately eight years. Notably, there is no authority which requires sexual relations between parties in order to constitute a "dating relationship." To so require would diminish the protections under the PDVA. While one date is clearly insufficient, S.K., 426 N.J. Super. at 239, 43 A.3d 1248, there can be no dispute that parties who engage in several public dates, hold themselves out to friends and family as dating and hope to progress in their relationship likely qualify as having a dating relationship. That hypothetical plaintiff would certainly qualify as a victim under the PDVA, even though the defendant may not have entered the plaintiff's home or bedroom nor had sexual relations with her. It would be illogical to protect that hypothetical plaintiff but deny this plaintiff "victim" status.
These parties engaged in a consensual, but sporadic, sexual relationship for eight years. The defendant came to plaintiff's bedroom on invited occasions and shared intimate and highly personal encounters with her. As in J.S., to slavishly adhere to traditional notions of dating would be to ignore "the parties' own understanding of their relationship ...." 410 N.J. Super. at 616, 983 A.2d 1151. For the courts to deny this plaintiff victim status could potentially been seen as morally judging a plaintiff who chooses not to engage in a relationship with "traditional" and "observable" indicia of dating. It would also be contrary to the purposes of the PDVA to deny a long-term consensual sexual partner of the protections of the act, especially when the alleged violence occurs in her home. State v. Hoffman, 149 N.J. 564, 584, 695 A.2d 236 (1997) ("The scales of justice remind us that the public as well as this victim have a right to feel safe when alone in their own homes.") (quoting State v. Mosch, 214 N.J. Super. 457, 466, 519 A.2d 937 (App. Div. 1986) ).
*458 In a footnote, the Andrews court left open the possibility of a "secret" dating relationship. Andrews, 363 N.J. Super. at 260 n.3, 832 A.2d 379 ("There is certainly the potential that individuals could be in a 'secret' dating relationship, in which the parties intentionally go out of their way not to hold themselves out as a dating couple, in which case the other factors would logically carry more weight."). Here, factors (2) and (6) of Andrews carry significant weight. The eight-year duration of their relationship, coupled with the intensity *159 of their intimate encounters, compels the court to recognize the parties as being in a "dating relationship." It would be contrary to the purposes of the PDVA to exclude a person in plaintiff's shoes from victim status. A person engaged in a secret intimate or sexual relationship with an abusive partner is just as vulnerable, if not more so, than a person engaged in a traditional dating relationship.
III.
Prior to granting an FRO pursuant to the PDVA, the judge must conduct a "two-step analysis" of a plaintiff's claim. N.T.B v. D.D.B., 442 N.J. Super. 205, 216, 121 A.3d 910 (App. Div. 2015). "First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19 [ (a) ] has occurred." Ibid. (alteration in original) (quoting Silver v. Silver, 387 N.J. Super. 112, 125, 903 A.2d 446 (App. Div. 2006) ). If the plaintiff satisfies his or her burden, the court must then determine "whether [it] should enter a restraining order that provides protection for the victim." Silver, 387 N.J. Super. at 126, 903 A.2d 446. Our Supreme Court has emphasized that an FRO should not be entered without "a finding that 'relief is necessary to prevent further abuse.' " J.D. v. M.D.F., 207 N.J. 458, 476, 25 A.3d 1045 (2011) (quoting N.J.S.A. 2C:25-29(b) ). Factors to be considered include:
(1) [t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse; (2) [t]he existence of immediate *459 danger to person or property; (3) [t]he financial circumstances of the plaintiff and defendant; [and] (4) [t]he best interests of the victim and any child. ...
[ N.J.S.A. 2C:25-29(a).]
N.J.S.A. 2C:25-29(a) permits the introduction of evidence of the "previous history of domestic violence." That history is admissible "[b]ecause a particular history can greatly affect the context of a domestic violence dispute," thus, "trial courts must weigh the entire relationship between the parties ...." Cesare v. Cesare, 154 N.J. 394, 405, 713 A.2d 390 (1998). "A history of domestic violence may serve to give context to otherwise ambiguous behavior and support entry of a restraining order." J.D., 207 N.J. at 483, 25 A.3d 1045. The judge must construe any such acts in light of the parties' history to better "understand the totality of the circumstances of the relationship and to fully evaluate the reasonableness of the victim's continued fear of the perpetrator." Kanaszka v. Kunen, 313 N.J. Super. 600, 607, 713 A.2d 565 (App. Div. 1998) ; N.J.S.A. 2C:25-29(a)(1).
Here, plaintiff alleges defendant committed the predicate acts of assault and harassment. A person commits a simple assault if he "attempts to cause or purposely, knowingly or recklessly causes bodily injury to another." N.J.S.A. 2C:12-1(a)(1). Bodily injury means "physical pain, illness or impairment of physical condition." N.J.S.A. 2C:11-1(a). It is well-settled bodily injury can occur from a slap in the face which causes a stinging sensation, State v. Downey, 242 N.J. Super. 367, 371, 576 A.2d 945 (Law Div. 1988), as well as physical discomfort and non-specific pain caused by a kick. State in the Interest of S.B., 333 N.J. Super. 236, 243-44, 755 A.2d 596 (App. Div. 2000). Likewise, pain caused by repeated strikes qualifies as bodily injury. State ex rel. T.S., 413 N.J. Super. 540, 543, 997 A.2d 233 (App. Div. 2010). There is no doubt the actions of defendant in slapping plaintiff with an open hand, pulling her hair and choking her likely caused bodily injury. Plaintiff concedes she consented to that bodily injury. Plaintiff asserts *160 she did not consent to a punch with a closed fist.
Two days after the incident, plaintiff sought treatment at a local urgent care center. She testified her jaw was bruised and painful.
*460 Discharge instructions from the urgent care center were admitted without objection. Those records showed plaintiff was diagnosed with a "jaw injury." Three radiographic views of the mandible were taken and showed "[n]o acute fracture. No dislocation." Further, the radiologist concluded, the "visualized soft tissues [were] within normal limits." Plaintiff received no further treatment. The court also admitted two photographs of plaintiff's face, one taken on the day of the incident and the other two days later. While plaintiff testified she was bruised, the photographs were unremarkable for any bruising, except perhaps barely perceptible discoloration. The trial occurred ten days after the incident and the court could not observe any bruising on the plaintiff's face at that time. The defendant admits to striking the plaintiff with one, self-described "playful," "tap" to the jaw. Based upon the lack of serious injury, the court is convinced plaintiff sustained only bodily injury, not significant or serious bodily injury, as those terms are defined in N.J.S.A. 2C:11-1(b), (d), as a result of both the consented to physical contact as well as the disputed punch.
In addition, the defendant undoubtedly and admittedly engaged in conduct which amounts to offensive touching under the harassment statute, N.J.S.A. 2C:33-4(b),[4] if done with a purpose to harass another. Subsection (b) of the harassment statute provides a person commits harassment if, "with purpose to harass another," he "subjects another to striking, kicking, shoving, or other offensive touching or threatens to do so." Purposeful conduct or "with purpose" is established if it is the defendant's "conscious object" to engage in such conduct or to cause such a result. N.J.S.A. 2C:2-2(b)(1).
But for plaintiff's admitted consent to "rough sex," the elements of simple assault and harassment by offensive touching could easily be found. Consent is an affirmative defense under New Jersey's criminal code, N.J.S.A. 2C:2-10. Specifically, consent to *461 bodily harm is a defense pursuant to N.J.S.A. 2C:2-10(b), which provides:
b. Consent to bodily harm. When conduct is charged to constitute an offense because it causes or threatens bodily harm, consent to such conduct or to the infliction of such harm is a defense if:
(1) The bodily harm consented to or threatened by the conduct consented to is not serious; or
(2) The conduct and the harm are reasonably foreseeable hazards of joint participation in a concerted activity of a kind not forbidden by law; or
(3) The consent establishes a justification for the conduct under chapter 3 of the code.
Defendant has the burden of establishing an affirmative defense by a preponderance of the evidence. N.J.R.E. 101(b) ; Clark v. Clark, 429 N.J. Super. 61, 78, 57 A.3d 1 (App. Div. 2012). Here, plaintiff consented to "slapping," "choking" and "hair pulling." Those acts likely caused bodily harm and, but for her consent, would constitute simple assault. She contends she drew "the line" at a closed fist punch. Defendants admits throwing one punch with a closed fist to plaintiff's jaw and describes the same as a "tap."
*161 Plaintiff never clearly described the so-called second punch alleged in her complaint and the court concludes there is insufficient proof of a second punch. While plaintiff denies consenting to the punch, she concedes the parties never expressly defined the limits of their agreement to engage in "rough sex." The court can clearly understand why elevating consensual rough sex from slapping, choking and hair pulling to a punch may potentially cross the line between the parties. However, plaintiff's actions belie her claim of non-consent. Plaintiff admittedly continued to engage in voluntary sexual relations with defendant for another twenty minutes after the punch, despite claiming at trial to have been "shocked." Defendant agrees plaintiff "objected" to the punch, but nevertheless continued with consensual sexual relations.
In theory, there may be a significant difference between an open hand slap to the face and a full-force closed fist punch to the jaw. Under the facts of this case, particularly based upon the court's credibility determinations, there is little, if any, appreciable difference between a hard slap to the face and a tap to the jaw.
*462 With respect to consent to bodily harm, "the consent of the victim will preclude the infliction of the harm or evil sought to be prevented by the law." Cannel, N.J. Criminal Code Annotated, cmt. 2 on N.J.S.A. 2C:2-10 (2016-2017).
However, this incident should not be analyzed in a vacuum. Rather, the court must consider the history between the parties and "weight their entire relationship" as it can greatly affect the context of a domestic violence dispute. Cesare, 154 N.J. at 405, 713 A.2d 390. While not obligated to find a past history of abuse to enter an FRO, Cesare, 154 N.J. at 402, 713 A.2d 390, the parties' history enables the court to better understand "the totality of the circumstances of their relationship ...." Kanaszka, 313 N.J. Super. at 607, 713 A.2d 565. There was no credible testimony by plaintiff regarding a history of violence.[5] Instead, the undisputed historical recitation of the parties is a pattern and practice of consensual "rough sex."
Under the circumstances, especially in light of the history between the parties, the court concludes the proofs are in equipoise as to whether defendant committed a simple assault or whether plaintiff consented to bodily injury that included a punch. N.J. Div. of Youth & Family Svcs. v. N.S., 412 N.J. Super. 593, 615, 992 A.2d 20 (App. Div. 2010) ("Under the preponderance standard, 'a litigant must establish that a desired inference is more probable than not. If the evidence is in equipoise, the burden has not been met.' ") (quoting Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 169, 892 A.2d 1240 (2006) ). See also Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 5a on N.J.R.E. 101(b)(1) (2017). For the same reasons, the proofs are in equipoise *463 as to whether defendant had a "purpose to harass" or reasonably believed plaintiff consented to offensive touching.
Despite these findings, the court concedes the ruling is a close call as to whether defendant's decision to elevate the "rough sex" to a punch was appropriate. For that reason, the court proceeds to analyze whether a final restraining order *162 is necessary under the two-step analysis of Silver, 387 N.J. Super. at 125, 903 A.2d 446.
Commission of one of the enumerated acts of domestic violence, without more, does not require the issuance of an FRO; the judge must conduct a "two-step analysis" of a plaintiff's claim. N.T.B, 442 N.J. Super. at 216, 121 A.3d 910. Thus, the question in the second step is whether an FRO is "necessary to prevent further abuse." J.D., 207 N.J. at 476, 25 A.3d 1045.
There is a lack of history of domestic violence between these parties. The complaint contained allegations of a prior history, but plaintiff's testimony never included any prior history of violence. There is no proof of prior threats, harassment or abuse. Likewise, there is no evidence of an immediate danger to persons or property. Further, the "history" between the parties establishes a pattern and practice of agreeing to "rough sex," without objection, rather than a history of abuse. The context of their relationship militates against a finding an FRO is necessary.
The court rejects plaintiff's conclusory testimony regarding defendant's "impulsivity." It was unsupported by any facts. Plaintiff admitted she invited defendant to her home on September 18.[6] Both parties agree defendant has not come to plaintiff's home uninvited, a strong indication an FRO is not "necessary" to protect plaintiff. No impulsive conduct of defendant was established. Likewise, the court rejects plaintiff's claim that "other women" should *464 be protected from defendant. The second prong of Silver mandates the court consider "whether [it] should enter a restraining order that provides protection for the victim." Silver, 387 N.J. Super. at 126, 903 A.2d 446 (emphasis added). No case law or reading of the PDVA supports the entry of an FRO for the protection of the general public or other persons with whom defendant may come into contact. Moreover, the entry of an FRO in favor of a particular plaintiff would not protect other third parties unrelated to the case in which the FRO was entered.
Based upon all of the foregoing, the court dismisses the domestic violence complaint and vacates the TRO.

Those factors are: (1) Was there a minimal social interpersonal bonding of the parties over and above a mere casual fraternization? (2) How long did the alleged dating activities continue prior to the acts of domestic violence alleged? (3) What were the nature and frequency of the parties' interactions? (4) What were the parties' ongoing expectations with respect to the relationship, either individually or jointly? (5) Did the parties demonstrate an affirmation of their relationship before others by statement or conduct? (6) Are there any other reasons unique to the case that support or detract from a finding that a "dating relationship" exists? Andrews, 363 N.J. Super. at 260, 832 A.2d 379.

Neither party provided copies of any text messages, but both testified their understanding and expectation was to have "rough sex."

During her initial testimonial description of the incident, plaintiff only briefly mentioned the second punch alleged in the complaint.

The court concludes that subsections (a) and (c) of the harassment statute are not applicable to the facts of this case.

The complaint alleged defendant has a history of "verbally and emotionally abusing" plaintiff, including making fun of her weight, her family and career path, as well as calling her derogatory names. It would likely have made little difference if plaintiff testified about these allegations as "[v]ulgar name-calling alone is not domestic violence." R.G. v. R.G., 449 N.J. Super. 208, 226, 156 A.3d 1074 (App. Div. 2017) (citing E.M.B. v. R.F.B., 419 N.J. Super. 177, 182-83, 16 A.3d 463 (App. Div. 2011) ).

The court does not deny plaintiff relief because she invited defendant to her home for consensual sexual relations. She is deserving of victim status if subjected to an act of domestic violence. But when considering whether a restraining order is "necessary" under the second prong of Silver, the court concludes plaintiff's invitation to defendant is relevant and probative.